2015 IL App (1st) 123157

SECOND DIVISION
September 17, 2015

No. 1-12-3157

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 5336 |
| | ) | |
| ANTHONY SHAW, | ) | Honorable |
| | ) | Evelyn B. Clay, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Neville and Simon concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Anthony Shaw asserts the State failed to prove beyond a reasonable doubt that he committed robbery because (i) when the police searched him and the area shortly after the alleged offense, no money or gun was found and (ii) a Chicago Transit Authority surveillance video directly contradicts the most incriminating aspects of the complainant's initial account to authorities. We reverse, finding the evidence presented at trial insufficient to convict where numerous aspects of the victim's testimony contained material inconsistencies, including accounts contrary to evidence from a surveillance camera and testimony from police officers.

¶ 2                          Background

¶ 3     At trial, Luke Gibson testified that he got on a blue line CTA train at the Oak Park stop around 9:45 p.m., heading into Chicago on the evening of February 11, 2012. The only other passenger slept several rows away from him. During the ride, Shaw, whom Gibson identified in court, entered Gibson's car and sat across the aisle from him. Shaw tapped Gibson on the shoulder and told him, "We are going to do this the easy way or the hard way." He then told Gibson to give him all of his money. Gibson pulled out his wallet and realized he only had $2. Shaw became "comical angry" and pulled a seven to eight inch long, semiautomatic handgun out of his pocket. He placed the gun in Gibson's side, asked for money, and volunteered that he "didn't want to have to kill" him. Gibson argued with Shaw, wanting to know why he was willing to "ruin the rest of [his] life" over $2 and refused to give Shaw his iPhone. Shaw did not ask to look inside Gibson's backpack or try to take it.

¶ 4     Gibson maintained that he and Shaw continued to argue, and at some point, Shaw noticed Gibson's ATM card and told him to go to an ATM at the upcoming UIC-Halsted stop and withdraw cash. During the 10 or 15 minutes that followed, a teenage girl got on the train, looked in their direction, and got off at a nearby stop. Gibson agreed that nothing happened after this girl saw him being robbed at gunpoint, despite emergency buttons on the train platforms. He also agreed that the man who was sleeping never awoke while the two argued. Shaw never pushed Gibson, or put his hands on him, at any point during their encounter; however, according to Gibson, while on the train Shaw threatened to shoot him if he ran.

¶ 5     When the train stopped at the UIC-Halsted, Shaw told Gibson that he would follow him to the ATM. The two men walked alongside one-another towards the ATM and continued to argue. Eventually, Gibson walked well ahead of Shaw on the ramp as he proceeded to the ATM

machine. Shaw stopped at the turnstile and waited. The ATM was around a corner. There were 10 or 15 people coming and going in the station area and Shaw could not see Gibson at the ATM. Gibson did not try to gain anyone's attention or use his iPhone to call the police. Gibson withdrew $20, the minimum amount. He returned to the turnstiles and claimed to have given Shaw money. He again began to argue with Shaw, asking why he "would rob somebody at gunpoint over $20," while leaning casually on the turnstile, for more than a minute and a half. Gibson shared cigarettes with Shaw and then walked out of the station. Looking in the reflection of the station doors, he noticed Shaw was watching him.

¶ 6      Gibson maintained that he thought Shaw had a gun on him the entire time and argued with Shaw during their entire encounter. Gibson also maintained that Shaw used "aggressive body language" and gestured his arms "aggressively" towards Shaw.

¶ 7      Once outside the station, Gibson flagged down a mass transit police car and told the officers he had been robbed. As the officers entered the station, Gibson ran half a block down the street, asserting at trial that he was afraid. Sometime later, he saw the officers leave and he returned to the station. When he learned that the mass transit officers had released Shaw, he notified different officers and filed a report. Three days later, on February 14, the officers showed Gibson an array of six men's photos. Gibson chose Shaw's picture. On February 15, Gibson identified Shaw in a lineup at a police station.

¶ 8      The State entered into evidence three videos from the station's security cameras.  Gibson indicated that he had seen the videos, and identified himself and Shaw in each clip. The first video showed Gibson and Shaw walking down the platform from the train, talking to each other. The second video showed the men walking along a ramp between the platform and the station

entrance. Halfway along the ramp, Gibson began to walk significantly ahead of Shaw. In the final video, Gibson walked through the station turnstiles and to an ATM. Shaw stopped at the turnstile. Several other people moved through the station while Gibson stood at the ATM. Gibson returned to Shaw and interacted, but their position and distance from the camera make it unclear what exactly occurred. After about a minute, Gibson walked away and Shaw continued to stand at the turnstiles looking in Gibson's direction. Then, Shaw walked through the turnstile and threw a small, unidentifiable object in the trash can. He continued to walk forward and off camera. About 15 seconds later, multiple people in the station begin to stare in Shaw's direction. Some two minutes after he walked off camera, two officers appear on camera with Shaw in handcuffs. One officer searched through the trash can. The officers then walked with Shaw out of the camera's range.

¶ 9    Chicago police officer Rzeszutko testified that he began an investigation of Gibson's robbery report on February 14, 2012. He generated a photo array comprised of six photographs, including Shaw's. Rzeszutko met with Gibson and showed him the photo array. Gibson identified Shaw's photo as the man who robbed him.

¶ 10    After the close of the State's case in chief, Chicago police officer Eddie Cevallos testified for Shaw. He and his partner, Kenny Mok, were assigned to the CTA on the night of February 11, 2012. Gibson ran up to the officers' car and said someone had "tried to rob him." After speaking with Gibson, Cevallos and his partner approached Shaw at the station. They searched his person and the station, but found no gun or cash. Cevallos found Gibson to be "uncooperative" because he left after initially speaking with the officers.

¶ 11    Chicago police officer Mayoski testified that she responded to a call for an armed robbery at the Halsted train station on February 11, 2012. At the station she spoke with Gibson and interviewed him later that night at the police station. Gibson never mentioned $2 or Shaw's demand for his cell phone. Gibson did say that Shaw told him, "Give me everything you have," and he responded, "I'm not giving you anything." Shaw had walked behind him on the train platform. Gibson told Mayoski that he "fled" out of the station after he gave Shaw his money.

¶ 12    Chicago police officer Robert Cibas testified that he spoke with Gibson on February 15, 2012. Gibson related that he told Shaw he did not have a cell phone. He also told the officer that Shaw pulled out a "short barrel," semiautomatic gun after Gibson gave him $2. Later, Shaw pushed Gibson against a wall. At the turnstiles, Shaw told Gibson that he would shoot him if he ran.

¶ 13    Genia Denham, an investigator for the Cook County public defender's office, testified that she interviewed Gibson on June 19, 2012. Gibson told her that Shaw stood only a few feet from him at the ATM and ran off after receiving $20.

¶ 14    Shaw entered into evidence a stipulation that Gibson had previously testified at a preliminary hearing that Shaw "pointed at the ATM and told me to withdraw cash."

¶ 15    The trial court acquitted Shaw of the charged counts, but found Shaw guilty of the lesser included offense of robbery, noting that officers did not recover "the weapon or even the funds." While the court expressly found Gibson to be credible, it noted that Gibson appeared to "vacillate between fear and being indignant," adding, there was "no rule book" on how a victim should act. The court further explained that the videos corroborated the interaction between Shaw and Gibson and the "essential elements" of the offense.

¶ 16                              Analysis

¶ 17    Shaw contends that the State failed to prove him guilty beyond a reasonable doubt because the evidence of robbery was so "unreasonable, improbable, or unsatisfactory" that it created a reasonable doubt. He notes that when the police searched Shaw and the station, they found neither cash nor a gun. He further points out that Gibson's prior statements, as related by the police officers' and Denham's testimony, conflict with his testimony at trial.  Further, he argues that the surveillance videos presented at trial render Gibson's testimony "too improbable to believe."

¶ 18    The State responds that sufficient evidence was presented at trial to prove Shaw guilty of robbery beyond a reasonable doubt and that the trial court explicitly found Gibson's testimony to be credible, a determination that deserves great deference on review.

¶ 19    Due process obligates the State to prove each element of a criminal offense beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004), (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Our task is to assess whether the evidence supports the conviction beyond a reasonable doubt. When reviewing the sufficiency of evidence, a reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Cunningham*, 212 Ill. 2d at 278, quoting *Jackson*, 443 U.S. at 319 A reviewing court will not overturn a guilty verdict unless the evidence is "so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005). While a reviewing court must resolve all reasonable inferences in favor of the prosecution (*Cunningham*,

212 Ill. 2d at 280), if the only reasonable inference from the record supports the defendant, the court must draw that conclusion. *Collins*, 214 Ill. 2d at 217.

¶ 20    The testimony of a single witness may suffice to support a criminal conviction, but only when that testimony is positive and credible. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The fact finder's assessment of witnesses "is not conclusive," but given great deference (*Cunningham*, 212 Ill. 2d at 280) because the fact-finder can see and hear the witnesses while the reviewing court must necessarily rely on the written record. See *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001). Where a conviction depends on eyewitness testimony, the testimony is insufficient "where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. A reviewing court will reverse a conviction based on eyewitness testimony where that testimony is "improbable, unconvincing or contrary to human experience." (Internal quotation marks omitted.) *Ortiz*, 196 Ill. 2d at 267; see also *Smith*, 185 Ill. 2d at 545 (serious inconsistencies and repeated impeachments rendered central witness incredible and merited reversal); *People v. Coulson*, 13 Ill. 2d 290, 297 (1958) (alleged victim's testimony was contrary to "human experience," thus, insufficient to support conviction).

¶ 21    A conviction for robbery requires the State prove beyond a reasonable doubt that the defendant (1) knowingly took property from another's person or presence (2) through either the use or threat of imminent force. See 720 ILCS 5/18-1(a) (West 2012).

¶ 22    The State must prove beyond a reasonable doubt that Shaw used or threatened force against Gibson. The State's proof relied wholly on Gibson's testimony that Shaw had threatened to shoot and kill him. Gibson indicated that most of his actions were motivated by the fear that

Shaw would shoot him. Yet, he did not testify that he merely believed Shaw had a gun. Gibson positively testified that he actually saw Shaw's gun. He described the type, color, and size of the gun. And, more than just see it; Gibson felt Shaw press the gun into his side. Given the certainty and specificity of his account, one could not reasonably infer that Gibson mistakenly believed that Shaw had a gun. Thus, the presence of a gun is integral to the credibility of Gibson's account. Yet, according to Officer Cevallos's unimpeached testimony, Shaw did not have a gun when the transit officers frisked him and no gun was found when the officers searched the station. If Gibson's testimony of a gun is to be believed, therefore, Shaw must have hidden or disposed of the gun sometime before the frisk.

¶ 23    The trial court acquitted Shaw of armed robbery, noting "the station was under camera surveillance and they did not recover the gun or even the funds," and "there's no sighting of [the gun] other than the victim's testimony." We have thoroughly reviewed the surveillance videos, which support the trial judge's conclusion. At no time during the videos can Shaw be seen hiding a firearm nor does he have an apparent opportunity to do so. Consequently, the only reasonable conclusion is that if Shaw hid a gun, he did so during one of the three periods that he was not under video surveillance: before the beginning of the first video, during the one minute or so between the first and second videos, or during the two minutes Shaw is off screen in the middle of the final video.

¶ 24    We find that one could not reasonably infer that Shaw hid the gun in either of the first two periods for several reasons. First, according to Gibson's testimony, he was with Shaw for the entirety of both periods. Shaw held a gun to Gibson during the train ride and walked alongside him from the train car until just before they reached the turnstiles. Yet, Gibson did not testify that

he witnessed Shaw discard or hide the gun. If Gibson had witnessed this action, then he would no longer have had any reason to fear that Shaw would shoot him once they reached the turnstiles and no reason to give him money rather than flee. Second, even if Shaw had managed to somehow abandon the gun without the immediately adjacent Gibson noticing, there was no reason for him to do so. No police officers were present. And, he had yet to receive any money. No reasonable person could conclude beyond a reasonable doubt that Shaw discarded a gun during either of these periods when he had neither opportunity nor motivation to do so.

¶ 25 The State failed to prove that Shaw was able to secrete the handgun so well in a matter of seconds that its whereabouts eluded the police. Shaw walks off camera towards the station's exit and about 15 seconds later, other individuals in the station begin to stare in that direction. Less than two minutes later, the officers walk on camera with Shaw in handcuffs. To conclude that Shaw was able to secrete the gun from the officers, one would have to infer that in less than two minutes, Shaw hid the gun (and discarded the cash for that matter) and the officers approached, detained, frisked, and handcuffed him. One also would have to infer that Shaw could quickly and easily conceal the gun in a hard-to-find place not visible to the surveillance camera or noticed by those either around the station or looking in his direction.

¶ 26 As the surveillance videos and the police testimony belie that Shaw had an opportunity to dispose of the handgun, the only reasonable conclusion is that he never had a gun in the first place. Accordingly, we find Gibson's testimony regarding a handgun too implausible to be deemed credible. We recognize that the trial court found portions of Gibson's testimony credible, and that the fact-finder weighs how flaws in a part of a witness's testimony affect the credibility of the whole. *People v. Herman*, 407 Ill. App. 3d 688, 707 (2011) (finding witness's testimony

too seriously flawed to warrant credible). But, the fact finder's determination must not be against the manifest weight of the evidence. *People v. Whiting*, 365 Ill. App. 3d 402, 406 (2006) (where findings of fact depend on witness's credibility, reviewing court will defer to trial court's findings unless findings are against manifest weight of the evidence). Given the specificity of Gibson's claim of the presence of a gun and the centrality of that claim to his account of the robbery, the police officers inability to locate the gun badly undermines his entire testimony.

¶ 27    Additionally, Gibson's testimony faced numerous impeachments. Some of them were on minor details that Gibson allegedly omitted when speaking with police officers on the night of the robbery, including not mentioning to Officer Mayoski that Shaw took his original $2 and asked for his cell phone. It is the duty of the trier of fact to resolve any minor discrepancies and inconsistencies presented by the evidence. See *Cunningham*, 212 Ill. 2d at 283. But many inconsistencies that exist here are material. Officer Mayoski testified that Gibson told him that Shaw had walked behind him on the train platform. Gibson testified that defendant was alongside him, as the video portrayed. Officer Cibas testified that Gibson stated Shaw had pushed him against a wall and later threatened him at the turnstiles. At trial, Gibson testified that Shaw never pushed him and the video showed he was far ahead of Shaw by the time he reached the turnstiles. Investigator Denham testified that Gibson stated Shaw stood only a few feet from him at the ATM and ran off after receiving $20. This was directly contradicted by the video evidence. And, at a preliminary hearing, Gibson testified that Shaw pointed at the ATM and told him to withdraw cash. This, too, was directly contradicted by the surveillance video.

¶ 28    While alone none of these various impeachments necessarily render Gibson's testimony incredible, viewed in their entirety, the impeachments show that Gibson's account at trial repeatedly strays from what he told police and from the videos. In light of this evidence,  the State failed to meet its burden of proof. Our supreme court in *People v. Smith,* 185 Ill. 2d 532, 545-46 (1999), has explained that the prosecution's failure to meet its burden of proof should not be seen as implying defendant's innocence, but as the exercise of the court's "duty to ensure that all citizens receive those rights which are applicable equally to every citizen who may find himself [or herself] charged with a crime, whatever the crime and whatever the circumstances. When the State cannot meet its burden of proof, the defendant must go free."

¶ 29    Finally, we note that the surveillance video seriously calls into question Gibson's account of his encounter with Shaw. While the trial court found that the videos corroborated the essential elements of a robbery, we disagree**.** As our supreme court observed in *People v. Radojcic*, 2013 IL 114197, ¶ 34, a trial court does not occupy a position superior to the appellate courts in evaluating evidence that is not live testimony. That is, we give less deference to a trial court's determinations of fact when they are based on evidence other than live witness testimony. Viewing the interactions captured by the surveillance video, Gibson's various statements to the officers and his explanation of events at trial simply were too improbable, unconvincing, and contrary to human experience to sustain the conviction. See *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001).

¶ 30    As we have acknowledged, great deference is due to the factual findings of the trial court. *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). Yet, when the fact-finder's determinations are against the manifest weight of the evidence we are required to reject them. *Smith*, 185 Ill. 2d

at 541. Gibson's account was implausible on this record, which reveals Shaw had no opportunity to dispose of the gun which Gibson testified Shaw pointed directly at him. Numerous impeachments of his testimony further undermine his credibility. Finally, when considered against the surveillance footage, his testimony runs contrary to human experiences. Considering all these factors, we find that no reasonable trier of fact could have found Gibson's testimony credible.

¶ 31                                  Conclusion

¶ 32    Therefore, even when taking all the evidence in the light most favorable to the State, we find that a rational trier of fact could not have found Shaw guilty of robbery beyond a reasonable doubt. Accordingly, the judgment of the circuit court of Cook County is reversed. *People v. Williams*, 239 Ill. 2d 119, 126 (2010).

¶ 33    The constitutional prohibition against double jeopardy (U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 10) applies to preclude the State from retrying the defendant after a reviewing court reverses a conviction based on evidentiary insufficiency. Therefore, "the only proper remedy is a judgment of acquittal." *People v. Williams*, 239 Ill. 2d 119, 133 (2010); accord *Tibbs v. Florida*, 457 U.S. 31, 40-42 (1982).

¶ 34    Reversed.