2022 IL App (1st) 191391-U

SECOND DIVISION
June 14, 2022

No. 1-19-1391

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 18 CR 12578 |
| DOMETRIC BUCKLEY, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | James B. Linn, |
| | ) | Judge Presiding. |
| | ) | |
| | ) | |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Cobbs concurred.

**O R D E R**

¶ 1    *Held*: The circuit court properly denied the defendant's motion to quash arrest and suppress evidence based on the officers' testimony regarding the traffic stop that resulted in the discovery of a firearm inside the defendant's vehicle. The municipal ordinance (Municipal Code of Chicago, Ill. §9-76-230) pursuant to which the officers effectuated the traffic stop is consistent with and does not conflict with the Illinois Vehicle Code (625 ILCS 5/12-610.2 (West 2018)). It was therefore not an invalid exercise of Chicago's home rule authority.

¶ 2    After a stipulated bench trial in the circuit court of Cook County, the defendant, Dometric Buckley, was found guilty of one count of armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2018)) and sentenced to six years' imprisonment. On appeal, the defendant contends that the circuit court erred in denying his motion to quash arrest and suppress evidence where: (1) the arresting officers' belief that he was illegally using a cellular phone based on "holding a cellular phone" while inside his vehicle was an objectively unreasonable mistake of law; (2) Officer Pagan's testimony that he saw the defendant holding and talking into a cellular phone while driving was incredible and rebutted by video footage from both the police squad car and the officers' body cameras; and (3) section 9-76-230 of the Chicago Municipal Code (Municipal Code or Chicago ordinance) (Municipal Code of Chicago, Ill. §9-76-230), pursuant to which the officers performed the investigatory stop that resulted in the search of the defendant's vehicle is inconsistent with and conflicts with the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/12-610.2 (West 2018)) and was therefore not a valid basis for the stop. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    The record before us reveals the following relevant facts and procedural history. In September 2018, the defendant was charged with, *inter alia*, the offense of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2018)) when a gun was found in the console of a rental vehicle that he was driving. The gun was discovered by two Chicago police officers after they detained the defendant for a traffic violation, *i.e.*, they observed the defendant driving while using his cellular phone in violation of section 9-76-230 of the Municipal Code (Municipal Code of Chicago, Ill. §9-76-230).

¶ 5    Prior to trial, the defendant filed a motion to quash arrest and suppress evidence on the basis that the two officers lacked reasonable suspicion to stop his vehicle. The following relevant

evidence was adduced at the suppression hearing.

¶ 6    Officer Angel Nunez testified that around 4:30 p.m. on August 11, 2018, he was in a marked squad car driven by his partner Officer Pagan near 4810 West Chicago Avenue. Officer Nunez stated that Officer Pagan told him that he observed the driver of a red Hyundai, later identified as the defendant, using his cell phone while driving. Officer Nunez did not see the defendant himself, and acknowledged that when his partner observed the defendant, the defendant's vehicle was passing the squad car in the opposite direction, underneath a viaduct, which separated the two lanes of traffic with steel beams. Officer Nunez, however, testified that the beams were about 10 feet apart, so that it was possible for Officer Pagan to see through them into oncoming traffic. Officer Nunez therefore testified that when the officers subsequently curbed the defendant's vehicle, it was his understanding that the defendant was being stopped because he "was on his cell phone."

¶ 7    Officer Nunez next averred that once the defendant's vehicle was curbed, he observed the defendant making "sudden movements" towards the center of the vehicle. The officer stated that he exited the squad car and approached the defendant's vehicle from the passenger side. As he did so, he observed the defendant holding his cell phone in his hand.

¶ 8    According to Officer Nunez, at this point, Officer Pagan asked the defendant for his insurance card and driver's license, but the defendant indicated that the car was rented and that he had insurance through the rental agency.

¶ 9    A few minutes later, Officer Pagan ordered the defendant out of the vehicle, informing him that he smelled marijuana. According to Officer Nunez, Officer Pagan walked the defendant to the rear of the vehicle, whereupon the defendant told him that he had marijuana in his pocket.

¶ 10    At this point, Officer Nunez performed a search of the defendant's vehicle. He stated that

3

he first observed cannabis residue on the driver's seat. The officer then searched the closed center console, where he found a firearm and six bags of cannabis on top of the weapon. After speaking with the defendant, Officer Nunez learned that the defendant did not have a Firearm Owner's Identification (FOID) card or a conceal-carry license.

¶ 11    Officer Nunez acknowledged that he later learned that Officer Pagan was able to view the defendant's car rental agreement from the defendant's cell phone. Officer Nunez admitted, however, that neither he nor Officer Pagan ever checked the defendant's cell phone to determine whether he was using it in hands-free mode, or what he was using it for.

¶ 12    Chicago Police Officer Pagan next testified consistently with Officer Nunez. He stated that at approximately 3:37 p.m. on August 11, 2018, he was working near 4810 West Chicago Avenue, with Officer Nunez, when he observed the defendant violating a Chicago city ordinance by "operating a motor vehicle while using a cellular device."

¶ 13    Officer Pagan stated that he was driving his police car heading eastbound, in the south lane on Chicago Avenue, near Kilbourn Avenue, when he observed the defendant, who was the sole occupant, driving a red vehicle with "his cell phone in his hand" and "speaking into it." Officer Pagan acknowledged that he could not hear what the defendant was saying or whether he was operating his cell phone using voice commands.

¶ 14    Officer Pagan explained, however, that in Chicago it is illegal to "hold a cell phone while driving," and that this was his reason for initiating the traffic stop. The officer testified that once the defendant curbed his vehicle, he approached the defendant from the driver's side. Officer Pagan stated that at this point the defendant still had his cell phone in the same hand with which he was holding it when the officer first observed him on his phone while driving.

¶ 15    Officer Pagan further averred that after he asked the defendant for his insurance card and

driver's license, he smelled marijuana inside the defendant's vehicle. He therefore asked the defendant to step outside and informed him of the reason. While Officer Pagan continued to speak with the defendant, his partner alerted him to the recovery of a firearm and marijuana in the center console of the defendant's vehicle. The officers then placed the defendant inside the police car and transported him to the police station.

¶ 16     Officer Pagan acknowledged that he never checked the defendant's cell phone to determine whether the defendant used voice-command to initiate a phone call, or any buttons on his cell phone to initiate hands-free operation of that device.

¶ 17     In addition to the testimony of the two officers, at the suppression hearing, the parties presented the court with video and audio footage from both officers' body cameras as well as the dash-camera on their squad car.

¶ 18     The dash-camera footage shows the defendant's vehicle from about 300 feet, turning west from Kilbourn Avenue onto Chicago Avenue and then proceeding at a high speed under a viaduct towards the police squad car. From this distance and the glare from the defendant's windshield it is impossible to see inside the defendant's vehicle as it is turning onto Chicago Avenue.

¶ 19     The dash-camera footage further shows the two vehicles passing each other under the viaduct within a matter of seconds. The viaduct divides opposite-lanes of traffic on Chicago Avenue with a concrete slab about half the size of an SUV and four steel pillars supporting the structure. Because of the angle of the dash-camera, and the speed with which the vehicles pass each other, the footage does not reveal what is happening inside the defendant's vehicle. In addition, because the audio for the dash-camera was turned on only after the officers effectuated the traffic stop, any conversation between the two officers regarding what Officer Pagan may or

may not have observed about the defendant's activities while the two vehicles were passing each other is not obtainable.

¶ 20    According to the dash-camera footage, six seconds after the two vehicles pass each other, the squad car slows down on Chicago Avenue and makes a U-turn at the next intersection. The squad car then accelerates to catch up to the defendant's vehicle and pulls the vehicle over a couple of blocks away.

¶ 21    The officers' body camera footage further confirms that Officer Pagan exited the squad car to approach the defendant's curbed vehicle from the driver's side, while Officer Nunez exited to approach from the passenger side. At this point, Officer Nunez is also heard saying, "Be careful, he is reaching for something."

¶ 22    Contrary to both officers' testimony, however, footage from both body cameras reveals that upon the officers' approach, the defendant did not have his cell phone in his hand, but rather on his lap, and plugged into the vehicle.

¶ 23    Officer Pagan's body camera footage further establishes that when the officer approached the defendant's vehicle, the defendant had already rolled down his window, and had his driver's license in his left hand. After handing the officer his driver's license, the defendant informed him that the car was a rental. When Officer Pagan asked to see the rental agreement, the defendant looked in the glove compartment, but then picked up his cell phone from his lap, stating that he had an electronic copy of the rental agreement on his phone.

¶ 24    The body camera footage further shows that after the defendant spent several seconds manipulating his cell phone to find the agreement, Officer Pagan asked him to step out of the vehicle. The defendant complied and was immediately handcuffed. When the defendant asked why he had to get out of his car, the officer responded that he smelled "weed."

¶ 25    Officer Pagan's body camera footage next reveals that after the defendant was escorted to the front of the police car, he was again asked to use his cell phone to find the rental agreement. Together, the defendant and Officer Pagan manipulated the defendant's cell phone, after which Officer Pagan verbally acknowledged that he saw the rental agreement on the phone.

¶ 26    The body camera footage next reveals that the defendant asked Officer Pagan why he was pulled over, to which Officer Pagan responded that that he saw the defendant "on his cell phone" when he came off Kilbourn Avenue. The defendant is then heard denying ever using his cell phone.

¶ 27    The body camera footage also documents a conversation between Officer Pagan and Officer Nunez, which took place outside of the police station about 25 minutes after the defendant was arrested. During this conversation, the officers discuss the circumstances of the stop, the fact that the defendant had marijuana on him and that they observed him "reach in the area." The officers then discuss whether the charges against the defendant will be approved because he was driving a rental vehicle, whereupon Officer Pagan states that they "would go with the reach though and see what they say."

¶ 28    At the conclusion of the evidence, defense counsel argued that the officers lacked probable cause to stop the defendant's vehicle. Counsel asserted that pursuant to section 12-610.2 of the Vehicle Code (625 ILCS 5/12-610.2 (West 2018)) there were numerous exceptions to the prohibition of using a cell phone while driving, including operating the phone in hands-free or voice-activated mode, or using a button to initiate or terminate a call. Counsel asserted that despite having access to the defendant's phone, the officers did nothing to determine whether the defendant was in fact using his cell phone in a manner prohibited by law. Counsel therefore argued that Officer Pagan's testimony that he saw the defendant "holding" and "maybe

7

talking" on his cell phone did not constitute illegal conduct so that there was no probable cause for the stop.

¶ 29    The State, on the other hand, asserted that holding a cell phone in one's hand provided sufficient probable cause. According to the State, even if the statue allowed for single button operation or speaker phone operation, a driver was nonetheless prohibited from holding the phone while using the device. In addition, the State argued that the officers saw the defendant reaching toward the center console where the firearm was recovered.

¶ 30    In response, defense counsel asserted that the statute prohibited using, but not holding, a cell phone, that one still had to pick up the phone and press a button to operate it, and that the officers saw the defendant only briefly under the viaduct. In addition, with respect to the officers' testimony regarding the defendant's reach towards the center console, counsel argued that this occurred only after the traffic stop so that it was irrelevant to the suppression issue.

¶ 31    After hearing arguments, the circuit court denied the defendant's motion to suppress. In doing so, the court stated that the issue was whether the defendant was committing "an offense of a municipal ordinance" by texting or using a cell phone while driving. The court found that the officers testified clearly about their observations prior to the stop. In addition, once the stop was made, there was "a strong odor of marijuana" and "certain movements" by the defendant which caused the officers to "take this a step further." The court concluded that the stop was not "wholly unreasonable" under the Fourth Amendment because once the marijuana odor was detected, asking the defendant to exit the vehicle "became necessary not just as a cell phone investigation, but a marijuana investigation." In addition, the officers found the gun where the defendant "appeared to be reaching."

¶ 32    The defendant filed a motion to reconsider, arguing that at the time of the traffic stop the

officers had no basis for "any articulable suspicion" that he was committing a crime. The defendant also argued that the video footage of his arrest showed that he was reaching for the marijuana in his pocket, not the gun in the center console. The court denied the defendant's motion, finding that it raised "the same matters that were brought to [its] attention originally." The court also found that the center console may have contained more marijuana, justifying the officers' subsequent search.

¶ 33    The defendant subsequently proceeded by way of a stipulated bench trial. The court incorporated the testimony and video evidence from the defendant's suppression hearing and the parties stipulated that the defendant was convicted of two qualifying felonies, namely unlawful use of a weapon by a felon (case No. 14 CR 40857) and possession of a controlled substance (*i.e.*, less than 1 gram of heroin) with intent to manufacture or deliver (case No. 10 CR 07861).

¶ 34    In closing argument, defense counsel asserted that the State failed to prove beyond a reasonable doubt that the defendant had knowledge that the gun was inside the console because the vehicle was a rental and not in his name. Defense counsel further argued that the defendant was reaching for marijuana and not the gun in the vehicle's center console, so that his movement did not support the conclusion that he knew about the gun beyond a reasonable doubt.

¶ 35    The court disagreed and found the defendant guilty of one count of AHC.

¶ 36    The defendant filed a motion for a new trial asserting that: (1) the court should have granted his motion to suppress; and (2) offering new exculpatory evidence, namely an affidavit from Danielle Gordon, proving that he did not know about the gun. In her affidavit, Gordon, who had been friends with the defendant for about 10 years, averred that on August 10, 2018, she was driving the rental car with the defendant and left her 9mm handgun inside the center console. Gordon attested that she never told the defendant that she either brought the gun into his car or

that she left it there.

¶ 37    At the subsequent evidentiary hearing on the defendant's motion for a new trial, Gordon was appointed counsel and when called to testify asserted her Fifth Amendment right against self-incrimination. The court therefore denied the defendant's motion to call Gordon as a witness. The court then denied the entirety of the defendant's posttrial motion, noting that the arguments related to the suppression hearing had already been considered by the court.

¶ 38    At the subsequent sentencing hearing, the court heard arguments in mitigation and aggravation, after which it sentenced the defendant to six years' imprisonment (to be served at 85 percent) with three years of mandatory supervised release (MSR). The defendant now appeals.

¶ 39                                    II. ANALYSIS

¶ 40    On appeal, the defendant contends that the circuit court erred in denying his motion to quash arrest and suppress evidence because the arresting officers lacked reasonable articulable suspicion that a traffic violation was being committed when they stopped the defendant's vehicle, so as to justify their subsequent search of the vehicle and the discovery of the illegal firearm. In support, the defendant makes three separate contentions. First, he asserts that his conduct in holding his cell phone while driving was not illegal pursuant to section 9-76-230 of the Municipal Code (Municipal Code of Chicago, Ill. §9-76-230), and that the arresting officers' belief to the contrary was an objectively unreasonable mistake of law. Second, the defendant contends that regardless of the legality of his actions, Officer Pagan's testimony that he saw him "holding" and "speaking into" the cell phone was incredible because the officer could not have viewed the defendant from his position on the other side of the viaduct pillars. Third, the defendant contends that section 9-76-230 of the municipal ordinance (Municipal Code of Chicago, Ill. §9-76-230) is an invalid exercise of Chicago's home rule authority because it is

inconsistent with and conflicts with the Vehicle Code (625 ILCS 5/12-610.2 (West 2018)) and was therefore not a valid basis for the traffic stop. For the following reasons, we disagree.

¶ 41    We begin by noting that at a hearing on a motion to suppress evidence, the defendant has the burden of producing evidence showing that the evidence in question was obtained by an illegal search or seizure. *People v. Brooks*, 2017 IL 121413, ¶ 22. Once the defendant makes a *prima facie* showing of an illegal search and seizure, the burden shifts to the State to produce evidence countering the defendant's *prima facie* case.  *Id.*

¶ 42    In reviewing the circuit court's ruling on a motion to suppress evidence, we apply a two-part standard of review. See *People v. Gaytan*, 2015 IL 16223, ¶ 18; *People v. Grant*, 2013 IL 112734, ¶ 12. Under this standard, we accord great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *People v. Hackett*, 2012 IL 111781, ¶18. However, we give less deference to factual findings based on video evidence, because, unlike witness testimony, a trial court does not occupy a position superior to the appellate court in evaluating video evidence. *People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29. We review *de novo* the trial court's ultimate legal ruling as to whether the police officer had reasonable suspicion to perform the traffic stop, to warrant denial of the defendant's motion to suppress. *Id*.  In doing so, we are free to make our own assessments of the legal issues, based upon the findings of fact, and to draw our own conclusions. *Id*.

¶ 43    Both the United States Constitution and the Illinois Constitution prohibit unreasonable searches and seizures by police. See U.S. Const., amend IV; Ill Const. 1970, art. I § 6. A police officer's act of "stopping a vehicle and detaining its occupants constitutes a 'seizure' within the meaning of the fourth amendment." *People v. Timmsen*, 2016 IL 118181, ¶ 9.

¶ 44    Generally, searches and seizures are reasonable if they are supported by a warrant

establishing probable cause. *People v. Jones*, 215 Ill. 2d 261, 269 (2005). Accordingly, the decision to stop an automobile is reasonable where the police officers have probable cause to believe a traffic violation has occurred. *People v. McDonough*, 239 Ill. 2d 260, 267 (2010).

¶ 45     However, a traffic stop may be justified by less than probable cause where the officers have a "reasonable articulable suspicion" that a traffic violation has occurred. *People v. Hackett*, 2012 IL 111781, ¶ 20; *People v. Close*, 238 Ill. 2d 496, 505 (2010) (citing *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). While "reasonable, articulable suspicion" constitutes a less demanding standard than probable cause, the police "officer's suspicion must amount to more than an 'inchoate and unparticularized suspicion or "hunch" ' of [illegal] activity." *Timmsen*, 2016 IL 118181, ¶ 9 (quoting *Terry*, 392 U.S. at 27). Moreover, "[t]he investigatory stop must be justified at its inception[,] and the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those fact, reasonably warrant the governmental intrusion upon the constitutionally protected interest of the private citizen." *Timmsen*, 2016 IL 118181, ¶ 9. In other words, the officers must have "a particularized and objective basis for suspecting the particular person stopped" was violating the traffic law. *People v. Gaytan*, 2015 IL 116223, ¶ 20.

¶ 46     In judging the police officer's conduct, a reviewing court applies an objective standard and considers, " 'would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?' " *Timmsen*, 2016 IL 118181, ¶ 9. When evaluating a vehicle stop's validity "we consider 'the totality of circumstances—the whole picture.' " (Internal quotation marks omitted.) *Id.* "If reasonable suspicion is lacking, the traffic stop is unconstitutional, and evidence obtained as a result of the stop is generally inadmissible." *Gaytan*, 2015 IL 116223, ¶ 20.

¶ 47    Accordingly, in the instant case to decide whether the circuit court properly denied the defendant's motion to suppress, we must determine whether, at the time of the traffic stop, Officers Pagan and Nunez had reasonable, articulable suspicion that the defendant had violated a traffic law.

¶ 48    On appeal, the defendant contends that the officers had no such reasonable articulable suspicion because merely holding a cellular phone while driving is not illegal in Illinois. In support, the defendant cites to the plain language of section 9-76-230(a) of the Municipal Code (Municipal Code of Chicago, Ill. §9-76-230), which does not proscribe such conduct.

¶ 49    The State appears to agree that the Chicago ordinance (Municipal Code of Chicago, Ill. §9-76-230) does not prohibit merely holding a cellular phone but instead proscribes "using" such a device while driving. Nonetheless, the State contends that Officer Pagan's testimony that he observed the defendant speaking into the phone while holding it prior to the investigatory stop provides sufficient evidence that the defendant violated the ordinance by "using" his cellular phone while driving. For the following reasons, we agree.

¶ 50    In construing a statute our primary objective is to ascertain and give effect to the intent of the legislature. *People v. Diggins*, 235 Ill. 2d 48, 54-55 (2009). The best indication of the legislature's intent is the plain and ordinary language of the statute. *Id*. Where the statutory language is clear and unambiguous, we have no occasion to resort to aids of construction. *People v. Pullen*, 192 Ill. 2d 36, 42 (2000).

¶ 51    In the present case, section 9-76-230 of the Municipal Code, pursuant to which the defendant was stopped, provides in pertinent part:

> "(a) Except as otherwise provided in subsection (b) of this section, no person shall drive a motor vehicle while using a mobile, cellular, analog wireless or digital telephone.

13

'Using a mobile, cellular, analog wireless or digital telephone' shall include, but not be limited to, the following activities: (1) talking or listening to another person on the telephone; (2) text messaging; (3) sending, reading, or listening to an electronic message; or (4) browsing the internet via the mobile, cellular, analog wireless or digital telephone. ***

(b) The provisions of this section shall not apply to:

* * *

(2) Persons using a telephone with a 'hands free' device allowing the driver to talk into and listen to the other party without the use of hands." Municipal Code of Chicago, Ill. §9-76-230.

¶ 52    Under the plain language of the statute, it is apparent that the legislature intended to proscribe the "use" of cell phones "while driving." The statute clearly states that "no person shall drive a motor vehicle while using a mobile, cellular, analog wireless or digital telephone." Municipal Code of Chicago, Ill. §9-76-230(a). The ordinance further defines "use" as, among other things, "talking or listening to another person on the telephone." *Id.* The statute then carves out specific and limited exceptions for situations where a driver may operate a phone while driving, including, relevant to this appeal, using a "device allowing the driver to talk into and listen to the other party *without the use of hands*." (Emphasis added.) Municipal Code of Chicago, Ill. §9-76-230(b)(2). Accordingly, under the plain language of the ordinance, unless the driver has some ability to use the phone *without using his or her hands,* it is illegal to drive a car while using a cell phone. *Id.*

¶ 53    In the instant case, Officer Pagan testified that the reason for the traffic stop was that he observed the defendant "operating a motor vehicle while using a cellular device." Specifically, Officer Pagan averred that as the defendant was driving towards him on Chicago Avenue, he

observed the defendant with "his cell phone *in his hand*" and "speaking into it." Under these circumstances, we are compelled to conclude that the facts available to Officer Pagan at the time he observed the defendant were sufficient to provide him with reasonable, articulable, suspicion that the defendant was improperly "using" a cellular device while driving, as proscribed by section 9-76-230 of the Municipal Code (Municipal Code of Chicago, Ill. §9-76-230(b)(2)). Accordingly, we find that the officers were justified in effectuating the traffic stop.

¶ 54    The defendant nonetheless cites to section 12-610.2 of the Vehicle Code (625 ILCS 5/12-610.2 (West 2018)), for the proposition that his motion to suppress should have been granted because the officers failed to testify that they checked the defendant's cell phone to determine that he was not using it in hands-free mode. In support, the defendant points out that section 12-610.2 of the Vehicle Code has a more comprehensive list of exceptions to the use of cell phones while driving than the municipal ordinance, and that therefore his defense counsel properly argued at the motion to suppress hearing that the officers' testimony failed to consider these exceptions.

¶ 55    Specifically, the defendant points out that just as the municipal ordinance, section 12-610.2(a)-(b) of the Vehicle Code prohibits a person from operating a motor vehicle while "using" an electronic communication device. 625 ILCS 5/12-610.2(a)-(b) (West 2018)). Unlike the municipal ordinance, however, the state statute defines an electronic communication device to include, *inter alia*, a hand-held wireless device, but not a device that is "physically or electronically integrated into the motor vehicle." *Id*. In addition, the statute provides for several exceptions to the use of such a device, including: (1) hands-free or voice-operated mode, "which may include the use of a headset;" and (2) "pressing a single button to initiate or terminate voice communication." 625 ILC 5/12-610.2(d)(3), (d)(9) (West 2108). The defendant contends that at

the suppression hearing the officers admitted that they had access to his cell phone, but that they never checked the phone to determine whether he was using it in hands-free mode, or to press a single button to initiate a voice communication. Without such testimony, the defendant contends the officers had no basis for the traffic stop. We disagree.

¶ 56    Contrary to the defendant's position, the fact that the officers did not subsequently check the defendant's cell phone to determine whether he had been using it in hands-free mode while driving is irrelevant. The determination of whether an officer has a reasonable articulable suspicion for an investigatory stop is based upon the facts available to the officer at the time the stop is effectuated, and not after the stop has already occurred. See *Timmsen*, 2016 IL 118181, ¶ 9 (the question is " 'would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?' "). Accordingly, the officers' failure to check the defendant's phone after he was detained has no bearing on the issue of whether the stop itself was validly initiated. As already discussed above, Officer Pagan's testimony that he observed the defendant holding the phone in his hand while speaking into it, was sufficient evidence of improper "use" of the cell phone while driving to justify the stop.

¶ 57    Once the traffic stop was initiated, the defendant's movement toward the center console and the smell of marijuana emanating from his vehicle, further provided the officers with reasonable articulable suspicion of illegal activity, justifying their detention of the defendant and the search of his vehicle.

¶ 58    The defendant, nonetheless, contends that even if we find that the behavior observed by Officer Pagan prior to the traffic stop was proscribed by the ordinance, we should nonetheless reverse the denial of his motion to suppress because Officer Pagan's testimony was implausible

when compared to the video footage from the police squad car and the officers' body-cameras. In particular, the defendant argues that the dash-camera footage contradicts Officer Pagan's testimony that he could see inside the defendant's vehicle. Moreover, the defendant points out that contrary to the officers' testimony, the footage from their body cameras reveals that once his vehicle was pulled over the defendant did not have his cell phone in his hand, but rather on his lap and plugged into the vehicle. The defendant argues that this fact raises the inference that the defendant was using his phone in hands-free mode. We disagree.

¶ 59    Contrary to the defendant's position, nothing in any of the video footage directly rebuts Officer Pagan's testimony that he observed the defendant driving while holding the cell phone in his hand and speaking into it. While it is true that the dash-camera footage does not show the defendant holding his cell phone, the reason for this is plain. The dash-camera is affixed to the front of the squad car, and the glare from the defendant's windshield prevents the camera's view into the defendant's vehicle. Officer Pagan's position as the driver of the squad car, and his ability to turn left and look inside the defendant's vehicle, while driving past it underneath the viaduct, is therefore not rebutted. Moreover, the dash-camera footage corroborates Officer Nunez's description of that viaduct, as well as his observation that because of the placement of the pillars, it was possible for Officer Pagan to see through to the other side and into the defendant's vehicle.

¶ 60    Similarly, the fact that the defendant's phone was on his lap and plugged into his vehicle at the time of his arrest does not contradict Officer Pagan's testimony that he observed the defendant driving while holding that phone in his hand and speaking into it prior to the investigatory stop. This is particularly true where Officer Nunez testified, and the video footage corroborated his statement as to his observations, that the defendant reached towards the center

17

of the vehicle once the vehicle was stopped.

¶ 61    The defendant next contends that even if we find that the officers' testimony was credible and that the stop was justified pursuant to section 9-76-230 of the Municipal Code (Municipal Code of Chicago, Ill. §9-76-230), we must nonetheless reverse his conviction because the Chicago ordinance is inconsistent and conflicts with section 12-610.2 of the Vehicle Code (625 ILCS 5/12-610.2 (West 2018)) and was therefore an improper exercise of Chicago's home rule authority. Accordingly, the defendant asserts that because the ordinance is invalid it was not a proper basis for his stop.

¶ 62    At the outset, the defendant concedes that he did not challenge the validity of the municipal ordinance in his motion to suppress evidence. Nonetheless, he asks us to consider this issue on appeal. Because the State makes no objection in its brief, and the defendant's argument is essentially a facial constitutional challenge to the municipal ordinance, we will address the merits of his claim. See *In re J.W.*, 204 Ill. 2d 50, 61 (2003) (a facial constitutional challenge to a criminal statute can be raised at any time); *People v. Thompson*, 2015 IL 118151, ¶ 32 (forfeiture does not apply to a voidness challenge of a statute).

¶ 63    It is axiomatic that all statutes are presumed constitutional. *People v. Hollins*, 2012 IL 112754, ¶ 13. As such, this court will uphold statutes whenever reasonably possible, resolving all doubts in favor of their validity. *Id.*; see also *People v. Boeckmann*, 238 Ill. 2d 1, 6-7 (2010). To rebut the presumption of validity, the party challenging the constitutionality bears the burden of clearly establishing the alleged constitutional violation. *See Hollins*, 2012 IL 112754, ¶ 13; see also *People v. Kitch*, 239 Ill. 2d 452, 466 (2011).

¶ 64    Because a facial challenge to a statute voids the statute for all parties in all contexts it is "the most difficult challenge to mount successfully." *Napleton v. Village of Hinsdale*, 229 Ill. 2d

18

296, 305 (2008). Such a successful facial attack "is, manifestly, a strong medicine," and will be employed "sparingly and only as a last resort." *Poo–Bah Enterprises, Inc. v. The County of Cook,* 232 Ill. 2d 463, 473 (2009).

¶ 65 In the present case, the defendant challenges the municipal ordinance as an improper exercise of Chicago's home rule authority. Home rule is premised on the assumption that municipalities should be allowed to address problems with solutions tailored to their local needs. See *Palm v. 2800 Lake Shore Drive Condo Ass'n*, 2013 IL 110505, ¶ 29. Chicago derives its home rule powers from the Illinois Constitution of 1970. Section 6(a) of article VII of the constitution provides that:

> "[A] home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals, and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a).

The constitution further provides that the "[p]owers and functions of home rule units shall be construed liberally." Ill. Const. 1970, art. VII, § 6(m).

¶ 66 Our supreme court has explained that "[t]he home rule provisions of the 1970 Illinois Constitution were designed to alter drastically the relationship between our local and state governments," and that section 6(a) was written "with the intention to give home rule units the broadest powers possible." *Palm*, 2013 IL 110505, ¶¶ 29-30.

¶ 67 However, home rule powers are not unlimited, and the legislature may preempt the exercise of a municipality's home rule powers by expressly limiting that authority. Under article VII, section 6(h), the General Assembly "may provide specifically by law for the exclusive exercise by the State of any power or function of a home rule unit ***." Ill. Const. 1970, art. VII,

§ 6(h). If the legislature intends to limit or deny the exercise of home rule powers, the statute must contain an express statement to that effect, *i.e.*, that it has exclusive control of that power. *Palm*, 2013 IL 110505, ¶ 31. In other words, to limit home rule power, "[i]t is not enough that the State comprehensively regulates an area which otherwise would fall into home rule power." *Id.* If the legislature does not expressly limit or deny home rule authority, a municipal ordinance and a state statute may operate concurrently. *Id.*; see also Ill. Const. 1970, art VII, §6(i) ("Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit concurrent exercise or specifically declare the State's exercise to be exclusive.")

¶ 68     To restrict the concurrent exercise of home rule power, the legislature must enact a law specifically stating home rule authority is limited. *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 185-86 (1992). The legislature has codified this principle in section 7 of the Statute on Statutes, providing:

> "No law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of sections 6 of Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and the language specifically sets forth in what matter and to what extent it is a limitation on or denial of the power or function of a home rule unit." 5 ILCS 70/7 (West 2018).

¶ 69     Our supreme court has formally adopted section 7 as part of its home rule jurisprudence. *Schillerstrom Homes, Inc. v. City of Naperville,* 198 Ill. 2d 281, 287 (2001). Additionally, the legislature has enacted the Home Rule Note Act, which provides that "[e]very bill that denies or limits any power or function of a home rule unit shall have prepared for it before second reading

20

in the house of introduction a brief explanatory note that includes a reliable estimate of the probable impact of the bill on the powers and functions of home rule units." 25 ILCS 75/5 (West 2018). Our supreme court has interpreted that provision as the legislature's recognition of its principal role in determining whether to preempt or limit home rule power and its responsibility to use specific language when doing so. *Palm*, 2013 IL 110505, ¶ 33.

¶ 70 Moreover, our supreme court has consistently recognized that the home rule provisions of the Illinois Constitution are intended to " 'eliminate or at least reduce to a bare minimum the circumstances under which local home rule powers are preempted by judicial interpretation of unexpressed legislative intention.' " *Palm*, 2013 IL 110505, ¶ 34 (quoting *Scadron*, 153 Ill. 2d at 186, [Citation.]); *Schillerstrom Homes*, 198 Ill. 2d at 288. As such, our supreme court has concluded that if the constitutional design is to be respected, the courts should step in only in the clearest cases of oppression, injustice, or interference by local ordinances with vital state policies. *Scadron*, 153 Ill. 2d at 190.

¶ 71 In the present case, on appeal, the State argues that the city of Chicago properly exercised its home rule power in enacting the municipal ordinance because nothing in the Vehicle Code specifically limits the city's concurrent power to regulate cell phone usage while driving or expressly declares that the State's exercise of power to regulate such cell phone usage, as expressed in section 12-610.2 of the Vehicle Code (625 ILCS 5/12-610.2 (West 2018)), was intended to be exclusive.

¶ 72 The defendant, on the other hand, counters that sections 11-207, and 11-208.2 of the Vehicle Code (625 ILCS 5/11-207, 11-208.2 (West 2018)) show the legislature's intent to limit local authorities from enacting ordinances that conflict with section 12-610.2 of the Vehicle Code (625 ILCS 5/12-610.2 (West 2018)). We disagree.

¶ 73    As already noted above, in construing a statute our primary objective is to ascertain and give effect to the intent of the legislature. *Diggins*, 235 Ill. 2d at 54-55. Therefore, our inquiry always beings with the language of the statute, which is the most reliable indicator of the legislative intent. *Pullen*, 192 Ill. 2d at 42.

¶ 74    Section 11-208.2 "limit[s] the authority of home rule units to adopt local police regulations inconsistent herewith except pursuant to Sections 11-208, 11-209, 11-1005.1, 11-1412.1, and 11-1412.2 of this *Chapter of this Act*." (Emphasis added.) 625 ILCS 5/11-208.2 (West 2018)). In addition, section 11-207, titled "Provisions of Act uniform throughout state" provides in pertinent part:

> "The provisions of *this Chapter* shall be applicable and uniform throughout this State and in all political subdivisions and municipalities therein, and no local authority shall enact or enforce any ordinance rule or regulation in conflict with the *provisions of this Chapter* unless expressly authorized herein. Local authorities may, however, adopt additional traffic regulations which are not in conflict with the *provisions of this Chapter*, but such regulations shall not be effective until signs giving reasonable notice thereof are posted." (Emphasis added.)

¶ 75    From the plain language of the statute, it is apparent that both sections 11-207 and 11-208.2 apply only to "this Chapter," *i.e.*, Chapter 11 of the Vehicle Code titled "Rules of the Road." On the other hand, section 12-610.2 of the Vehicle Code, which the defendant claims, preempts the Chicago ordinance, is in Chapter 12, entitled "Equipment of Vehicles." Accordingly, sections 11-207 and 11-208.2 are limited in their scope and inapplicable to the present case.

¶ 76    In coming to this conclusion, we find the appellate court's decision in *Village of*

*Mundelein v. Franco*, 317 Ill. App. 3d 512, 515 (2000) to be directly on point. In that case the court considered two consolidated appeals, both involving home rule units which had adopted municipal ordinances requiring all occupants of vehicles to wear seatbelts and empowering the municipalities' police officers to pull over non-compliant drivers. *Id.* at 515. After both drivers were pulled over for failing to wear their seatbelts, they each filed motions to quash their arrests and suppress evidence, arguing that the home rule units were preempted from enacting ordinances allowing the police to stop drivers not wearing seatbelts, because under section 12-603.1 of the Vehicle Code a police officer "may not search or inspect a motor vehicle" solely because a passenger is not wearing a seatbelt. (625 ILCS 5/12-603.1. West 2018)). *Id.* at 516. Just as the defendant does here, in *Franco* the drivers pointed to sections 11-207 and 11-208.2 of the Vehicle Code (625 ILCS 5/11-207, 11-208.2 (West 200)) to argue that the Illinois legislature intended to prevent home rule units from enacting ordinances that conflicted with the State's own seatbelt law found in section 12-603.1 of the Vehicle Code 625 ILCS 5/12-603.1. *Id.* at 517.

¶ 77    The appellate court disagreed, finding that the municipal ordinances were not preempted because sections 11-207 and 11-208.2 of the Vehicle Code were limited to Chapter 11, and the state's seatbelt law was contained in Chapter 12 of the Code. *Id.* at 532. The court reasoned that the repeated use of the term "this Chapter" in sections 11-207 and 11-208.2, indicated the legislature's intent that those sections be specifically limited to Chapter 11. *Id.* at 518. The court therefore concluded that that the state's seatbelt law, which was contained in Chapter 12 of the Vehicle Code was unaffected.

¶ 78    Like the drivers in *Franco*, the defendant here is attempting to stretch the limitations of sections 11-207 and 11-208.2 to apply to section 12-610.2, which is contained in Chapter 12 of the Vehicle Code. We agree with the rationale of *Franco* and applying it here, find that Chicago is not preempted from concurrently regulating the use of cellular phones by drivers. See *Franco*,

317 Ill. App. 3d at 519.

¶ 79    The defendant next contends that even if sections 11-207 and 11-208.2 of the Vehicle

Code do not explicitly preempt the Chicago municipal ordinance, we should nonetheless find the

ordinance invalid because it governs the "movement of vehicles" and, as such, is generally

preempted by section 1-2.1-2 of the Illinois Municipal Code. See 65 ILCS 5/1-2.1-.2 (West

2018)). Citing to *Catom Trucking, Inc. v. City of Chicago*, 2011 IL App (1st) 101146, the

defendant asserts that under section 1-2.1-2 of the Illinois Municipal Code (65 ILCS 5/1-2.1-.2

(West 2018)), home rule municipalities cannot enact ordinances that are traffic regulations that

govern the "movement of vehicles," because they infringe upon the state's ability to address

problems that are statewide in nature. We disagree and find the defendant's reliance on *Catom*

*Trucking* misplaced.

¶ 80    Section 1-2.1-2 of the Illinois Municipal Code, upon which the defendant relies states in

full:

> "Any municipality may provide by ordinance for a system of administrative adjudication
>
> of municipal code violations to the extent permitted by the Illinois Constitution. A
>
> 'system of administrative adjudication' means the adjudication of any violation of a
>
> municipal Ordinance, except for (i) proceedings not within the statutory or the home rule
>
> authority of municipalities; and (ii) any offense under the Illinois Vehicle Code or a
>
> similar offense that is a traffic regulation governing the movement of vehicles and except
>
> for any reportable offense under Section 6–204 of the Illinois Vehicle Code." 65 ILCS
>
> 5/1-2.1-2 (West 2018).

¶ 81    Our courts have repeatedly interpreted this section to prohibit "the administrative

adjudication of moving violations." *Fischetti v. Village of Schaumburg,* 2012 IL App (1st)

24

111008, ¶ 7; see also *Catom Trucking Inc.,* 2011 IL App (1st) 101146, ¶ 18 ("moving violations * * * cannot be administratively adjudicated"). Contrary to the defendant's position, however, no Illinois case, including *Catom Trucking* has held that section 1-2.1.2 of the Illinois Municipal Code, preempts the city from passing any traffic regulations regarding the movement of vehicles. Instead, *Catom Trucking* merely held that the city was preempted from creating a "system of administrative adjudication of municipal code violations," for citations issued to drivers operating overweight trucks. *Catom Trucking*, 2011 IL App (1st) 101146, ¶¶ 18-19.

¶ 82    The present case, however, does not involve an administrative adjudication. Rather, it involves a traffic stop for the violation of a municipal traffic ordinance. As such, *Catom Trucking* has no bearing on the outcome of this appeal.

¶ 83    Nor could it since nothing in either section 1-2.1-2 of the Municipal Code or sections 11-207 and 11-208.2 of the Vehicle Code reflects a legislative intent to entirely preempt the field of traffic regulation. Rather, as already discussed above, "all municipalities are limited to enacting traffic ordinances that are consistent with the provisions of chapter 11 of the [Vehicle] Code and that do not upset the uniform enforcement of those provisions throughout the state." *People ex rel. Ryan v. Village of Hanover Park,* 311 Ill. App. 3d 515, 525 (1999). Accordingly, so long as the city ordinance is consistent with and does not conflict with the state's traffic laws or regulations, the ordinance is valid. *Ruyle v. Reynolds,* 43 Ill. App. 3d 905, 908 (1976).

¶ 84    In its last-ditch attempt to overturn the denial of his motion to suppress, the defendant argues that the Chicago ordinance is inconsistent and conflicts with the Vehicle Code because it attempts to regulate a statewide, rather than a local, problem, but then proscribes far wider conduct than that intended by the state. We disagree.

¶ 85    When determining if a conflict between a state statute and an ordinance exists, "the court

25

No. 1-19-1391

shall look to whether the municipal ordinance infringes upon the spirit of the State law or is repugnant to the policy of the State." *White*, 227 Ill. App. 3d at 330 (citing *Village of Mundelein v. Hartnett*, 117 Ill. App. 3d 1011, 1015 (1983)). The state statute is "the strongest indicator of public policy, and where the legislature speaks on a subject upon which it has constitutional power to legislate, the public policy is what the statute passed indicates." *Hartnett*, 117 Ill. App. 3d at 1015. Courts look to whether the ordinance was designed to pertain to the municipality's government and affairs, *i.e.*, problems that are local in nature, as opposed to statewide or national. *Commonwealth Edison Co. v. City of Warrenville*, 288 Ill. App. 3d 373, 379 (1997). If the problem addressed by the ordinance or statute has both local and statewide effects, courts consider the nature of the problem, the unit of government that has the most interest in a solution, and the traditional role of the local and state authorities to address the problem. *Id* Where there is a conflict between the statute and a municipal ordinance, "the ordinance must give way." *Hartnett*, 117 Ill. App. 3d at 1015.

¶ 86    In the present case, the plain language of the two enactments reveals that they are not in conflict. Both the municipal ordinance and the state statute use similar language to criminalized identical behavior, *i.e.,* they prohibit the use of cellular phones while driving, except in specific enumerated instances, all of which entail hands-free use. While it is true that the Vehicle Code provides a more detailed and narrower list of exceptions (permitting the use of a cellular device in hands-free or voice-operated mode, including a headset, and "pressing a single button to initiate or terminate voice communication"), both enactments are focused on eliminating the use of hands while driving by criminalizing such conduct.

¶ 87    Moreover, contrary to the defendant's position, proscribing cell phone usage while driving is not purely a statewide issue. As a home-rule unit, Chicago, with the largest population

26

and densest traffic in Illinois, has a local interest in extending the state statute to require drivers to put their phones in hands-free mode before they begin driving, rather than during the drive. Accordingly, as a home rule unit, Chicago was permitted to enact a stricter law with the same purpose as the state statute. See *Peters v. Springfield*, 57 Ill. 2d 142 (1974) (upholding a municipal ordinance requiring a lower retirement age for firefighters than the Illinois statutory maximum age).

¶ 88    The decision in *City of Wheaton v. Leorop*, 229 Ill. App. 3d 433, (2010) is instructive. In that case, the defendant pled guilty to driving under the influence of alcohol in violation of the Wheaton ordinance. *Id.* He was fined the minimum amount of $750, permitted under that ordinance. *Id.* The defendant challenged the fine, arguing that the Illinois statute criminalizing driving under the influence of alcohol preempted the municipal ordinance, and that the Illinois statute did not contain a minimum fine. *Id*. The Court agreed that under sections 11-207 and 11-208.2 of the Vehicle Code Wheaton was not permitted to enact DUI laws that conflict with the state statute. *Id*. at 435. However, the court found that even though the ordinance was different than the statute, the two laws were not in conflict. *Id*. at 436. The court held that the Illinois statute was silent on the issue of minimum fines, and that the addition of a minimum fine did not "infringe[] upon or [wa]s repugnant to the state laws." *Id*. Therefore, the court concluded that the two laws were not in conflict, and that it was within Wheaton's home rule authority to create a minimum fine. *Id*.

¶ 89    The present case is analogous. Chicago's ordinance explicitly prohibiting the use of hands is not repugnant to the state's goal of criminalizing using one's phone while driving and does not infringe upon Illinois's attempt to do so. Accordingly, the two enactments are not in conflict.

¶ 90    Regardless, even if they were, we would be reluctant to find preemption absent an explicit statement from our legislature showing its intent to limit or deny Chicago's home-rule powers. See *Palm*, 2013 IL 110505, ¶ 42 (holding that a Chicago condominium ordinance was a valid exercise of home-rule authority despite conflicts with the state statute, where the legislature did not expressly state an intent to limit or deny the exercise of home-rule powers.). "The legislature is perfectly capable of being specific when it wants to be." *Scadron*, 153 Ill. 2d at 188. Since, in this instance, it has chosen not to be, we find that the Vehicle Code does not preempt Chicago's authority as a home-rule unit to regulate the prohibition of cell phone usage while driving. *Id.*

¶ 91                                    III. CONCLUSION

¶ 92    For these reasons, we find that the traffic stop was valid, and that the circuit court properly denied the defendant's motion to quash arrest and suppress evidence.

¶ 93    Accordingly, we affirm the judgment of the circuit court.

¶ 94    Affirmed.