2022 IL App (1st) 192018-U

No. 1-19-2018

Order filed August 9, 2022

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 182 |
| | ) | |
| DIONTE TOWNER, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Howse and Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for aggravated assault of a peace officer over his contention that body camera footage contradicted officers' testimony that he pointed a "gun" at them.

¶ 2    Following a bench trial, defendant Dionte Towner was found guilty of two counts of aggravated assault of a peace officer. The trial court merged the counts and imposed a one-year prison term. On appeal, defendant contends that he was not proven guilty beyond a reasonable

doubt when body camera footage contradicted police officers' testimony that defendant pointed a "gun" at them.[1] We affirm.

¶ 3    Defendant was charged by indictment with multiple counts of aggravated assault of a peace officer (720 ILCS 5/12-2(b)(4.1) (West 2018)) following an incident on November 18, 2018. The State proceeded on three counts alleging that defendant knowingly placed Chicago police officer Talbot in reasonable apprehension of a battery by pointing a BB gun at him knowing that he was a police officer performing official duties (count I), in order to prevent Talbot from performing those duties (count II), and in retaliation for performing those duties (count III).[2]

¶ 4    Chicago police officer DePasquale testified that on the evening of November 22, 2018, she was at a police station monitoring the video feed from a pod camera located at Jackson Boulevard and Pulaski Road.[3] On the video feed, DePasquale observed a black man holding a "bulge of some sort" in a pocket. The man yelled at another man, crossed a street, and drew a "silver handgun," which he waved in the second man's face. DePasquale relayed this information over the "OEMC *** radio."

¶ 5    The parties stipulated to foundation for the pod camera footage, which was published and is included in the record on appeal. The footage, which lacks audio, depicts an African-American man in a two-tone sweatshirt holding a hat in his left hand as he paces the sidewalk. He interacts with two other men, then crosses a street. At one point, he draws what appears to be a silver gun

---

[1] On appeal, defendant refers to the object as a "gun." The trial transcript reveals that the officers also referred to the object as a "silver handgun," "silver firearm," or "firearm." The object was later determined to be a BB gun. For the sake of clarity, this court will adopt defendant's phrasing and refer to the object as a "gun" outside of direct quotations from, or references to, the trial transcript.

[2] Neither the indictment nor the report of proceedings contains Officer Talbot's first name.

[3] The report of proceedings does not contain Officer DePasquale's first name.

with his right hand and then places his right arm behind his back. The man's mouth opens and closes, and it appears that he is speaking. He waves the gun in front of his body and then turns to speak to the two men. He next places the gun in the front pocket of his sweatshirt and walks down the sidewalk with the other men, entering and exiting the frame. He puts on the hat and gestures with his right hand. Then, a bright light appears to the right of the frame and defendant runs to the left, out of frame, as officers pursue.

¶ 6     During cross-examination, DePasquale acknowledged that the video lacked audio and that the person with the handgun also held a hat. DePasquale did not know whether the object was a "real gun."

¶ 7     Talbot testified that on the evening of November 22, 2018, he and his partner, Officer Bodnar, responded to a call that a black man in a gray and blue sweatshirt was holding a "silver handgun" on the 3900 block of West Jackson.[4] The officers were uniformed and drove a marked squad car. When Talbot arrived, he observed a man, whom he identified in court as defendant, matching the description. Defendant looked toward Talbot and fled. Talbot, who had a flashlight, gave chase. He drew his firearm "due to the nature of the call" and because defendant was holding his left side.

¶ 8     From 15 to 20 feet, Talbot observed a "silver handgun" in defendant's right hand. Defendant fell to his knees and raised his hands while still holding it. Defendant then bent at the waist and pointed the "firearm" at Talbot, who believed he would be shot. Talbot prepared to fire. However, defendant put his right hand to his waist, dropped the gun, and ran. Talbot caught defendant and Bodnar handcuffed him. Talbot returned to the area where defendant knelt and

---

[4] The report of proceedings does not contain Officer Bodnar's first name.

recovered a "silver handgun." The object was metal, duct-taped at the magazine, and could not be cleared. Talbot later learned that it was a BB gun.

¶ 9     The parties stipulated to the foundation for Talbot's body camera footage, which was published and is included in the record on appeal. The quality of the footage is poor, as the only lighting is from streetlights and flashlights, and the frame jerks as Talbot chases and later tackles defendant.

¶ 10    In the footage, which contains audio, Talbot exits a squad car and runs across a street and into an empty lot. Defendant is present. Talbot yells, "put it down," and "get your f*** hands up." At one point, defendant kneels with something silver in his right hand, the hand closest to the camera. Defendant's hand moves backward and forward, and the footage appears to show something in the air behind defendant. Defendant then stands with a floppy black object in his right hand and is tackled by Talbot at approximately one minute and three seconds into the video. Talbot returns to the area where defendant knelt, and at approximately 90 seconds into the video, a silver gun is visible on the ground.

¶ 11    During cross-examination, Talbot testified that defendant only had a "silver handgun" in his hand. The defense then replayed the footage. During redirect, Talbot testified that defendant pointed a "gun" at him. Talbot did not fire his own weapon because defendant dropped his. During recross-examination, Talbot agreed that Bodnar was 10 feet away from Talbot and 10 to 15 feet away from defendant during the encounter and Bodnar did not have a flashlight.

¶ 12    At the close of the State's case, the defense moved for a directed finding, which the trial court granted as to count III.

¶ 13    The defense presented Bodnar, who testified that he observed a man, whom he identified in court as defendant, on the street. Defendant fled. During the pursuit, Bodnar observed defendant holding his right side. When defendant fell, Bodnar was to the left and Talbot was to the right. Defendant then turned, holding in his right hand what Bodnar believed was a "firearm." Defendant pointed it at Bodner and "thrusted" it at Talbot. Bodnar denied saying, while defendant was in the backseat of the squad car, that he just saw something black in defendant's hand. Rather, Bodnar believed that he said that he did not see defendant drop "it," and that "something black" was in defendant's hand.

¶ 14    The parties stipulated to the foundation of Bodnar's body camera footage, which was published and is included in the record on appeal. This footage, which does not show the chase and takes places in a vehicle, depicts Bodnar stating, "I didn't see him f*** drop it," and that Bodnar "saw something black in [defendant's] hand." In court, Bodnar acknowledged making these statements.

¶ 15    During cross-examination, Bodnar testified that he saw a weapon in defendant's hand when defendant was kneeling, and observed the same weapon again after Talbot recovered it. Defendant pointed it at Bodnar for a "split second" and then pointed it at Talbot. Bodnar did not realize that defendant dropped it until Talbot recovered it. During redirect, Bodnar testified that he did not remember defendant pointing anything else at him, only the "silver firearm."

¶ 16    In closing argument, the State asserted that Talbot emerged from a marked squad car in uniform, that defendant knew Talbot was a police officer, and that defendant pointed a silver "handgun" that looked "real" at him. Talbot believed the object was a handgun, placing him in reasonable apprehension of a battery. The State concluded that defendant was "lucky" to be alive

when the video established that Talbot believed he would be "shot" and was preparing to fire. The defense responded that the video showed that defendant only held a hat in his right hand, and did not depict him holding or dropping a gun.

¶ 17 The trial court found defendant guilty of counts I and II for aggravated assault of a peace officer. The court stated it relied on Talbot's testimony that he saw a gun in defendant's hand, which Talbot thought was pointed at him, and Bodnar's testimony that he thought defendant pointed a gun at Talbot. The court acknowledged that the officers differed regarding which side of the body defendant held as he ran, but concluded their testimony was mostly "consistent in the grand scheme of things." The court agreed that defendant held a hat, but he had "two hands" and the gun "came out during this interaction." Moreover, defendant knowingly engaged in conduct that placed Talbot in "reasonable apprehension of receiving a battery," and although there was a "hat out there," that was not the "only thing."

¶ 18 Defendant filed two motions for a new trial alleging, relevant here, that the body camera footage established that he only held a hat. At a hearing on the motions, trial counsel argued that the officers, who were in a high-crime area at night responding to a call of a man with a "gun," had the "mental projection" that defendant was "going to have a gun." Counsel concluded that the officers' testimony could not be reconciled with the video.

¶ 19 In denying a new trial, the court stated that defendant was found guilty when he knowingly engaged in conduct which placed another in reasonable apprehension of receiving a battery. The court concluded:

"Whether or not the gun was real *** does not matter at all. In fact, he didn't even have to have a gun to be found guilty of aggravated assault. The gun is not an element. It

could be anything in his hand that places someone in a reasonable apprehension of receiving a battery. So the crux of the argument is that [defendant's] action was not knowing.

* * *

Listening to the testimony of the officers and watching the video, totality of the circumstances in this case, [defendant's] actions that evening, it was dark. That was sufficient to establish *** that he did engage in conduct which knowingly placed another in reasonable apprehension of receiving a battery. *** I understand the argument, but it doesn't—whether the gun was in his hand, it really doesn't—the gun is not an element of the offense. It's the conduct."

¶ 20    At sentencing, the court merged count II into count I and imposed one year's imprisonment thereon. Defendant did not file a motion to reconsider sentence.

¶ 21    On appeal, defendant contends that he was not proven guilty beyond a reasonable doubt because the evidence did not establish that he knowingly pointed a "gun" at Talbot. Defendant posits that the video contradicts the officers' testimony, rendering the officers unworthy of belief.

¶ 22    When reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *Id.* "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the

trier of fact." *Id.* A defendant's conviction is reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 23 Here, to prove defendant guilty of aggravated assault of a peace officer, the State was required to establish that defendant knowingly, and without lawful authority, placed Talbot, a Chicago police officer performing his official duties, in reasonable apprehension of a battery by pointing a BB gun at Talbot. 720 ILCS 5/12-2(b)(4.1)(i) (West 2018); see also 720 ILCS 5/12-1(a) (West 2018) (an assault occurs when an individual "without lawful authority, *** knowingly engages in conduct which places another in reasonable apprehension of receiving a battery"). "Whether the victim was in reasonable apprehension of a battery is a question of fact." *People v. Enerson*, 202 Ill. App. 3d 748, 749 (1990). Reasonable apprehension is an objective standard and a victim's apprehension may be inferred from the evidence at trial, including the conduct of both the victim and the defendant. *In re Gino W.*, 354 Ill. App. 3d 775, 778-79 (2005).

¶ 24 Viewing the evidence in the light most favorable to the State, the trial court could find defendant guilty of aggravated assault of a peace officer. Talbot testified that he and Bodnar were uniformed and driving in a marked squad car. Defendant fled and Talbot chased him. From 15 to 20 feet, Talbot observed a "silver handgun" in defendant's right hand. Defendant fell to his knees, raised his hands while holding the "firearm," then bent over and pointed it at Talbot. Talbot believed defendant would shoot him and prepared to fire at defendant. See *In re Justin F.*, 2016 IL App (1st) 153257, ¶ 17 (reasonable apprehension may be inferred from the evidence presented at trial, including the conduct of both the victim and the defendant); see also *People v. Harkey*, 69 Ill. App. 3d 94, 96 (1979) (finding that the victim was in reasonable apprehension of a battery

where the defendant made verbal threats and pointed a firearm at the victim). However, defendant dropped the object and fled. Seconds after defendant was taken into custody, Talbot recovered a "silver handgun" from the area where defendant knelt. He later learned that the object defendant dropped was a BB gun. Bodnar also testified that he believed defendant held a "firearm," which defendant pointed at him and "thrusted" at Talbot. The trial court found the officers' testimony credible as evidenced by its guilty finding. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (the testimony of a single witness, if positive and credible, is sufficient to uphold a conviction).

¶ 25     Defendant, however, contends that the officers' testimony that he pointed a "gun" at them is contradicted by "unambiguous video evidence" from Talbot's body camera. Relying on *People v. Shaw*, 2015 IL App (1st) 123157, defendant argues that this court should not give deference to the trial court's credibility assessments because its findings depended on video evidence that is also available for this court's review.

¶ 26     Defendant is correct that in *Shaw*, we noted that a trial court does not occupy a superior position to this court when evaluating evidence that is not live testimony. *Id.* ¶ 29 (citing *People v. Radojcic*, 2013 IL 114197, ¶ 34). However, we explicitly recognized, "great deference is due to the factual findings of the trial court," and only "less deference" is accorded to the trial court's determinations of fact based on evidence other than live witness testimony. *Shaw*, 2015 IL App (1st) 123157, ¶¶ 29-30. Only when surveillance video and police testimony contradicted the victim's version of events, rendering it uncredible, did we reverse the conviction as being against the manifest weight of the evidence. *Id.* ¶ 26. Witness credibility remains a factor in our determination of the present case, and we will give "great deference" to the trial court's findings,

including its credibility assessments, unless, as in *Shaw*, the record shows that those findings are against the manifest weight of the evidence. See *id.* ¶ 30.

¶ 27    In the case at bar, we disagree with defendant's characterization of the body camera footage as unambiguous. While the body camera footage does not explicitly show an object resembling a gun in defendant's hand, it also does not disprove that defendant held one or that he pointed it at Talbot. Defendant is correct that the video depicts a black hat in his right hand when he gets up to run, but it also depicts something silver in the same hand while he is on his knees. Although the body camera video does not explicitly corroborate the officers' testimony, it does not, as in *Shaw*, render it improbable, unconvincing, or contrary to human experience. Accordingly, we cannot agree with defendant that the body camera footage contradicts the officers' testimony such that it renders their testimony incredible.

¶ 28    *People v. Kotlinski*, 2011 IL App (2d) 101251, is instructive. In that case, the defendant, a passenger in the vehicle his wife was driving, was convicted of obstruction of a peace officer for allegedly interfering with a police investigation into whether his wife was driving while under the influence. *Id.* ¶¶ 1, 18. The evidence consisted of testimony and footage of the defendant's conduct at the scene. *Id.* ¶¶ 4-34.

¶ 29    On appeal, the defendant contended that this court's review should be *de novo* because the video established that the facts of the incident were undisputed. *Id.* ¶ 38. In rejecting that contention, we explained that, although the video represented the "best evidence" of what occurred, there was "conflict in the testimony about what happened," the evidence was therefore not undisputed, and a *de novo* standard was inappropriate. *Id.* Ultimately, this court reversed the defendant's conviction, noting that video of the encounter contradicted the officers' testimony at

trial. *Id*. ¶ 41. In discussing what the video depicted, the court noted that the area was well-lit and that the testimony of the two officers contradicted "what is plainly on the video." *Id*. ¶¶ 7, 38.

¶ 30 Here, unlike in *Kotlinski*, the body camera footage is not clear and does not "plainly" contradict the State's witnesses' testimony. The lighting is poor, and it is difficult to ascertain exactly what transpired. Although the video does not corroborate the testimony that defendant pointed a gun at Talbot, it does not render it improbable, unconvincing, or contrary to human experience as in *Shaw*.

¶ 31 As discussed, Talbot testified that he was in uniform, defendant pointed a gun at him, and he feared defendant would shoot him. Although the body camera footage does not explicitly depict defendant pointing a gun at Talbot, it does not disprove that defendant did so, and a BB gun resembling a firearm was recovered less than a minute later from the area where defendant knelt. A trier of fact need not disregard inferences which flow normally from the evidence or seek all possible explanations consistent with innocence and raise them to the level of reasonable doubt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60.

¶ 32 Accordingly, viewing the evidence in the light most favorable to the State, we cannot say that no rational trier of fact could have concluded that defendant pointed a gun at Talbot. We reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains (*Newton*, 2018 IL 122958, ¶ 24); this is not one of those cases. We therefore affirm defendant's conviction.

¶ 33 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 34 Affirmed.