2024 IL App (1st) 230314-U

No. 1-23-0314

First Division
December 16, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | No. 19 CR 13726 |
|   v. | ) | |
| | ) | |
| SYLBASTIN HUMPHRIES, | ) | Honorable |
| | ) | Thomas J. Byrne, |
|     Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for being an armed habitual criminal is affirmed where (1) the evidence was sufficient to prove beyond a reasonable doubt that he possessed a gun, (2) it was harmless error for the trial court to allow inadmissible hearsay testimony, and (3) the trial court's admonishments to the jury did not violate Illinois Supreme Court Rule 431(b).

¶ 2    Following a jury trial, defendant-appellant Sylbastin Humphries was found guilty of being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7 (West 2022)) and was sentenced to seven

years' imprisonment. On direct appeal, he argues that: (1) the State failed to prove beyond a reasonable doubt that he possessed a gun; (2) the trial court erred in allowing the police officers to give hearsay testimony; and (3) the trial court violated Illinois Supreme Court Rule 431(b)(4) (eff. July 1, 2012) by failing to ask each juror whether they understood and accepted that defendant's refusal to testify could not be held against him. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      Defendant was charged in a six-count indictment relating to his conduct on September 7, 2019. The indictment alleged that he "knowingly or intentionally possessed a firearm" after having been previously convicted of aggravated robbery and unlawful use of a weapon. The State proceeded to trial on one count of AHC.

¶ 5      After the prospective jurors were sworn, at the outset of the jury selection process, the trial court admonished the prospective jurors. As relevant here, the trial court stated:

> "The defendant has the right to remain silent and does not have to testify and may rely on his presumption of innocence. If the defendant chooses not to testify[,] the fact that he chooses not to do so may not be considered by you in any way in arriving at your verdict.
>
> Is there anyone who does not understand and accept this legal principle of law[?] [I]f so[,] raise your hand now.
>
> Let the record reflect no one has raised [their] hand in response."

Defense counsel did not object to any of the court's admonishments. Before the trial began, the court reiterated to the selected jurors that "[i]f the defendant chooses not to testify, that fact may not be considered by you in any way in arriving at your verdict."

¶ 6      On November 16, 2022, the trial began, at which the following evidence was presented.

¶ 7 Chicago police officers Diondre Sweezer and Javier Collazo testified as to the events of September 7, 2019. In the early morning hours of September 7, 2019, Sweezer and Collazo, as well as their third partner, Chicago police officer Sieman,[1] who did not testify, were on patrol in an unmarked police SUV. Each of them was wearing a Chicago Police Department (CPD) vest over their plain clothes. Sweezer testified that the area they were in was a "gang conflict area."

¶ 8 Near 1344 South Springfield Avenue, the officers observed a group of "[e]ight to ten" males "drinking and smoking cannabis." Sweezer and Collazo each made an in-court identification of defendant as one of the men in the group. As the officers approached the group, Sweezer was in "the back right" of the squad car "behind the driver's seat"; Sieman was driving the car; and Collazo was in the front passenger's seat. The group was on the driver's side of the car. The vehicle stopped near the group and Sweezer exited and approached the group to conduct a field interview. According to Collazo, he and Sieman stayed in the vehicle, and Sieman drove forward "like 15 to 20 feet" further before stopping the vehicle.

¶ 9 As Sweezer approached, the officers observed defendant "separate himself from the group." Sweezer testified that defendant "bladed his stance like trying to avoid his left side" and "[a]s [defendant] was looking in [Sweezer's] direction, he immediately walked away from the group." Collazo also observed that, as Sweezer approached the group, defendant broke away from the group slowly and he bladed his body towards the SUV. Sieman and Collazo were about 30 to 40 feet away from defendant. Collazo testified that, as defendant turned towards them, he "could see the butt of a handgun on his front, left waistband area which his shirt was kind of like tucked behind the gun a little bit." Collazo stated that the handle of the gun was black, and he was

---

[1] Sieman's first name does not appear in the record.

"surprised to see a handgun just facing out at that point." Collazo confirmed that there was nothing obstructing his view of defendant at that time.

¶ 10    Relevant here, the following exchange occurred during the direct examination of Sweezer.

Prosecutor: What happened after defendant started walking away?

Sweezer: As he walked away, I heard Officer Sieman alerted to me –

Defense counsel: Objection.

The Court: Overruled.

Sweezer: Officer Sieman alerted to me that the defendant had a firearm on his left side.

Prosecutor: What happened after that?

Sweezer: After that, he immediately ran through the vacant lot.

Sweezer continued, stating that he followed defendant, through the vacant lot, the alley, and then through another vacant lot. On cross-examination, Sweezer confirmed that his partners alerted that they saw a weapon on defendant's hip. He also confirmed that when defendant bladed his stance as to conceal his left side, Collazo and Sieman, who were in the street were able to see defendant's left side. Defense counsel asked Sweezer: "So you are saying now as you are viewing my client here in this image, right, you didn't see what was in his left side but your partners, Officer Collazo and Sieman, alerted you to this firearm that they saw?" Sweezer responded: "Officer Sieman alerted me that he saw a firearm on his left side."

¶ 11    Collazo similarly testified that, after he observed the handgun, Sieman alerted to Sweezer because he also saw the handgun and defendant fled into a nearby vacant lot. Defense counsel did not object to this testimony. On cross-examination, Collazo confirmed that from his vantage point inside the vehicle, he was able to see a weapon on defendant's hip and his view was unobstructed.

Defense counsel asked Collazo what happened next, to which Collazo responded: "I believe me and Sieman had a quick conversation like that's a handgun on his left side and he alerted Officer Sweezer it's on his left side and he exited and it happened quickly." Collazo also testified that he could not recall when he activated his body cam but, even if it was recording while he was in the vehicle, it would not have been able to capture his view of defendant as he was seated inside the vehicle.

¶ 12    As Sweezer was pursuing defendant, Sweezer "observed him remove the firearm from his waistband area" and, as he was running, toss the gun with his right hand into a yard. Sweezer admitted that the perspective of his body-cam footage does not show defendant throw the gun and that he saw the firearm in defendant's hands for mere seconds before defendant tossed it into the yard. Sweezer testified that there was "limited lighting in the alley" but he could see the area better than the footage showed. During the chase, Sweezer gave verbal commands to stop, which defendant ignored. Sweezer eventually detained defendant and walked him back towards the area where he threw the gun.

¶ 13    After defendant fled, Sieman exited the vehicle, and Collazo entered the driver's seat and drove in the direction of the west alley between Springfield Avenue and Harding Avenue. He stopped the vehicle in the alley and observed Sweezer walking with defendant in handcuffs. Sweezer directed Collazo to the area where he believed the gun would be located. Collazo entered the yard and began to search using his flashlight. On cross-examination, he confirmed that he was using his flashlight to search the backyard because there was no light in the area and he would not have been able to find the weapon without it. Between one and three minutes later, Collazo recovered the gun, which he described as two-toned, nickel-plated with a black handle. Both

officers testified that the gun shown to them in court was the same gun Collazo recovered from the yard.

¶ 14    Regarding the body-cam footage, Sweezer confirmed that the body cams are not equipped with flash. Collazo testified that body cams are situated at the center of their chests, they are not capable of zooming in or out, and they would not necessarily capture what the individual is seeing because of their location on the body.

¶ 15    Both officers' body-cam footage were admitted into evidence and played before the court without audio. Sweezer's body-cam footage began with him walking towards a group of men standing on a sidewalk. As he approaches, the men lift their hands in the air. Defendant is seen stepping further away from the group and Sweezer begins to follow him, at which point defendant runs away through a vacant lot. Sweezer chases defendant into an alley and through a vacant lot. Eventually, defendant stops running on a sidewalk and Sweezer handcuffs him. The chase lasts approximately forty seconds. Because of Sweezer's movement while running, defendant cannot be seen clearly during the pursuit.

¶ 16    Collazo's body-cam footage showed him exiting the vehicle, walking down an alley, and observing Sweezer and defendant walking towards him. He then walks into a nearby vacant lot with his flashlight to search for the weapon. After about forty-five seconds, he climbs a fence and enters a backyard where he continues to search. After another forty-five seconds, he finds a handgun on the ground in the yard, near the house.

¶ 17    The parties stipulated that testing on the gun did not reveal the presence of any fingerprint ridge impressions.

¶ 18    Defendant moved for a directed finding, which the trial court denied. The defense rested without presenting evidence. One juror requested that the court clarify the parties' stipulations.

The parties then made closing arguments. During jury deliberations, the jury sent the judge two questions: (1) "How does the law define possession?" and (2) "What happens if we don't unanimously decide?" The court advised the jurors to use the plain meaning of the word "possession" and instructed that their verdict must be unanimous. The jury later returned a verdict finding defendant guilty of AHC.

¶ 19    On January 12, 2023, defense counsel filed a motion for a new trial, arguing, *inter alia*, that the State failed to prove defendant guilty beyond a reasonable doubt; the trial court erred when it allowed the body-worn camera video to be played and admitted without audio; the trial court erred when it "overruled [d]efendant's hearsay objections regarding the officers['] testifying to what other officers were saying and announcing while on scene and engaged in pursuit of" defendant; the State did not prove beyond a reasonable doubt that defendant possessed a gun "because upon viewing the video *** you never once see the [d]efendant possess the weapon or make any throwing movement with his arm as the officer described at trial"; the lack of ridge impressions on the weapon also showed lack of possession of the weapon; Sweezer's testimony was not credible in that "he could not illustrate the ability to show he could see what he claimed he saw based on his video"; "the officers['] ability to observe what they testified to is not supported by the videos introduced at trial and renders the testimony of the officers not credible"; and "it is clear and obvious that [defendant] never possessed the weapon that the officers recovered in that residential backyard."

¶ 20    On February 9, 2023, after hearing arguments on the motion, the trial court denied defendant's motion for a new trial.

¶ 21    That same day, the case proceeded to a sentencing hearing. The court sentenced defendant to seven years' imprisonment, to be served at 85% and followed by three years' mandatory

supervised release. Defense counsel made an oral motion to reconsider the sentence, which the trial court denied.

¶ 22    This appeal followed.

¶ 23                              II. ANALYSIS

¶ 24    On appeal, defendant argues that: (1) the State failed to prove beyond a reasonable doubt that he possessed a gun; (2) the trial court erred in allowing the police officers to give hearsay testimony; and (3) the trial court violated Illinois Supreme Court Rule 341(b)(4) (eff. July 1, 2012) by failing to ask each juror whether they understood and accepted that defendant's refusal to testify could not be held against him.

¶ 25                      A. Sufficiency of the Evidence

¶ 26    Defendant first argues that the State failed to prove beyond a reasonable doubt that he possessed a gun because the testimony of the two officers was contradicted by Sweezer's own body-cam footage. According to defendant, the State's evidence was insufficient to support his conviction for AHC and this court should reverse his conviction.

¶ 27    In response, the State asserts that the evidence was more than sufficient as nothing in the body-worn camera footage rendered either officer's testimony "incredible, let alone so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of defendant's guilt." Further, "[a] rational trier of fact *** could easily conclude that the video evidence, at the very least, did not contradict either Sweezer's or Collazo's accounts whatsoever and arguably only corroborated them."

¶ 28    When a defendant challenges the sufficiency of the evidence against him, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt.' " (Emphasis in original.) *People v. Collins,* 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact regarding the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 29    The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. To sustain a conviction for AHC, the State was required to show that (1) defendant possessed any firearm (2) after having previously been convicted of two or more qualifying offenses. 720 ILCS 5/24-1.7 (West 2022). There is no dispute in this case that defendant's criminal history included the requisite qualifying convictions. Thus, the only question is whether defendant possessed a firearm.

¶ 30    The evidence presented at trial shows that both officers unambiguously testified to observing defendant with a gun. Collazo testified that he saw the gun in defendant's waistband when he separated himself from the group and turned his body towards the SUV, and Sweezer testified that, during his pursuit, he saw defendant pull a gun from his waistband and toss it into a yard. A gun was then recovered from that same yard a few minutes later, and both officers identified the recovered weapon in court. Collazo further testified that he had an unobstructed vantage point to view defendant when he was on the sidewalk. The officers' testimony was not impeached, and their body-cam footage generally reflected the same sequence of events as their testimony. This evidence was sufficient for a rational trier of fact to determine that defendant possessed a weapon. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (the testimony of

a single witness, if positive and credible, is sufficient to uphold a conviction); *People v. Campbell*, 2019 IL App (1st) 161640, ¶ 33 (if witnesses' testimony is otherwise credible, the State need not present physical evidence connecting the defendant to the gun).

¶ 31    Nonetheless, defendant contends that the body-cam footage is dispositive and contradicts the officers' testimony because, according to defendant, there is no gun visible in defendant's waistband in the still frames from Sweezer's footage. He further contends that Collazo had a difficult vantage point and Sweezer had the better opportunity to see the gun but did not testify that he saw one when defendant was standing on the sidewalk. According to defendant, Collazo's testimony "proves unworthy of belief" when examined in conjunction with Sweezer's footage and "it is at best difficult to pinpoint where and when [Collazo's] car would have had any line of sight, at all, to [defendant's] left waistband area." Finally, he asserts that the footage of the pursuit of defendant "yields no image of a gun" in defendant's possession and the State presented no physical evidence that connected defendant to the gun Collazo recovered in the yard.

¶ 32    We disagree with defendant's characterization of the body-cam footage as contradictory. Although the footage does not affirmatively show a gun in defendant's waistband or in his hand, the footage also does not affirmatively refute the officers' testimony that defendant had a gun. The footage is blurry and shaky, and the incident occurred very quickly, making it difficult to determine from the footage alone whether defendant possessed a gun. The officers testified that the body cams do not capture everything their eyes see because of its position on their chest and that the lighting in the area was not accurately reflected in the footage. The footage, in our view, does not clearly support the officers' testimony that defendant possessed a weapon, but it also does not render the officers' testimony improbable, unconvincing, or contrary to human experience.

¶ 33    Regardless, any potential discrepancy between the footage and the officers' testimony was for the trier of fact to resolve. *People v. Williams*, 193 Ill. 2d 306, 338 (2000) (finder of fact weighs and resolves conflicts in the evidence). The jurors listened to the officers' testimony and were shown the body-cam footage multiple times. Moreover, defense counsel amply questioned the officers on their respective observations and viewpoints concurrently with their body-cam footage and still frames from it. Ultimately, the jury determined that defendant possessed a gun. This court cannot substitute its judgment for that of the trier of fact (*People v. McLaurin*, 2020 IL 124563, ¶ 22), and we may not reverse "simply because defendant claims that a witness was not credible or that the evidence was contradictory" (*Siguenza-Brito*, 235 Ill. 2d at 228). Further, a trier of fact need not disregard inferences which flow normally from the evidence or seek out all possible explanations consistent with innocence and raise them to the level of reasonable doubt. *In re Jonathan C.B.*, 2011 IL 107750, ¶ 60. Based on the evidence in the record, it was not unreasonable for the jury to find that defendant possessed a gun, and we will not disturb its judgment under these circumstances.

¶ 34    Defendant cites *People v. Shaw*, 2015 IL App (1st) 123157, to suggest that, where the video evidence calls into question the credibility of the witnesses' accounts, the reviewing court should find that no rational trier of fact could have found the testimony credible. In *Shaw*, on appeal from his conviction for robbery, the defendant argued that the surveillance video directly contradicted the victim's account to police and thus the victim's testimony was not credible. *Id.* ¶¶ 1, 17. In reviewing the trial court's credibility assessment, this court stated that it was in the same position as the trial court in evaluating the video evidence. *Id.* ¶ 29 (citing *People v. Radojcic*, 2013 IL 114197, ¶ 34). According to the court, the record showed that the victim testified that the defendant threatened to shoot and kill him, and the victim positively testified that he saw the defendant's gun

and described it in specificity. *Id.* ¶ 22. However, a police officer testified that the defendant did not have a gun or the money the victim claimed he gave the defendant when the defendant was frisked minutes after the alleged robbery, and no gun was found in the immediate area. *Id.* ¶¶ 10, 22. Further, the court's review of the surveillance videos showed that "[a]t no time during the videos can [the defendant] be seen hiding a firearm nor does he have the apparent opportunity to do so." *Id.* ¶ 23. The court also noted that the victim's testimony "faced numerous impeachments," some of which were material inconsistencies, and the surveillance videos "seriously call[ed] into question [the victim's] account of his encounter with [the defendant]." *Id.* ¶¶ 27, 29. Accordingly, this court reversed the defendant's conviction because the surveillance video and police testimony directly contradicted the victim's version of the event and the "only reasonable conclusion" was that the defendant never possessed a gun. *Id.* ¶ 26. In other words, the trial court's finding that the victim was credible was against the manifest weight of the evidence. *Id.* ¶ 30.

¶ 35     However, the court's decision in *Shaw* does not wholly nullify the deference owed to the trial court; rather, the *Shaw* court expressly recognized that "great deference is due to the factual findings of the trial court" *Id.* The same principle applies here, and we too give great deference to the trial court's factual findings in this case *unless* the record shows that those findings are against the manifest weight of the evidence. Here, unlike in *Shaw*, the factual findings were not against the manifest weight of the evidence. In particular, the body-cam footage did not contradict the officers' testimony in any way. Rather, it aligned with the officers' testimony of the sequence of events, although it did not affirmatively show whether defendant possessed a gun. Additionally, neither of the officers' testimony was impeached. Thus, the facts in *Shaw* are distinguishable from those before us and *Shaw* is not applicable here.

¶ 36    Rather, we find *People v. Towner*, 2022 IL App (1st) 192018-U (cited as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)), upon which the State relies, instructive. In *Towner*, the defendant was found guilty of aggravated assault of a peace officer following a bench trial. *Id.* ¶ 17. On appeal, the defendant argued that the evidence did not show he pointed a gun at the officer where the video evidence contradicted the officers' testimony, rendering their testimony incredible. *Id.* ¶ 21. This court affirmed the defendant's conviction, concluding that the trier of fact found the officers' testimony credible and the evidence presented supported the trier of fact's finding of guilt. *Id.* ¶ 24. The court disagreed with the defendant's characterization of the body-cam footage as "unambiguous," specifically stating that the video did not explicitly show a gun in the defendant's hand, although there did appear to be something silver in his hand, but also did not disprove that defendant held one. *Id.* ¶ 27. Just as in *Towner*, we conclude that the body-cam footage does not disprove the officers' testimony and, thus, the jury was free to find the officers' testimony credible. See *People v. Jasso*, 2024 IL App (1st) 221686-U, ¶ 30 (where the video did not explicitly show nor rebut the officer's testimony that the defendant discharged a firearm in the officer's direction); *People v. Magnuson*, 2019 IL App (2d) 160551, ¶ 48 (although the video "somewhat impeach[ed]" the testifying officers, it was not clear enough to contradict or corroborate the defendant's testimony, and the trier of fact could have reasonably resolved any apparent conflicts in the evidence against the defendant).

¶ 37    As explained, there was unambiguous testimony from the officers that defendant possessed a gun, and their testimony was not rendered implausible by their body-cam footage. Accordingly, viewing the evidence in the light most favorable to the State, as we must, we conclude that there was sufficient evidence to support defendant's conviction for AHC.

¶ 38                                B. Hearsay Testimony

¶ 39     Next, defendant argues that the trial court erred in allowing the officers to provide testimony as to a third non-testifying officer's statement, as that testimony was inadmissible hearsay. Defendant asserts that this hearsay testimony "served only to impermissibly buttress the State's case" despite bearing no relevant nonhearsay purpose. Further, according to defendant, the trial court's error in allowing this testimony was so prejudicial as to warrant reversal of defendant's conviction and remand for a new trial.

¶ 40     The State contends that Sieman's out-of-court statement regarding the gun on defendant's left side was not offered for the truth of the matter asserted; rather, it was "offered (1) to demonstrate its effect on the listener and (2) as an excited utterance."[2]

¶ 41     "Admissibility of evidence is within the discretion of the trial court, and its ruling will not be reversed unless there has been an abuse of discretion." *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004). An abuse of discretion will be found only where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Ilgen*, 145 Ill. 2d 353, 364 (1991).

¶ 42     Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted. *People v. Tenney*, 205 Ill. 2d 411, 432-33 (2002). This type of evidence is generally excluded due to the defendant's lack of opportunity to cross-examine the declarant. *Jura*, 352 Ill. App. 3d 1080, 1085 (2004). However, "[a] statement offered for some reason other than for the

_____

[2] Both parties have addressed the issue of preservation of the alleged error in their briefs. However, the State concedes that defendant has preserved this issue, and we agree. A defendant "must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005). Here, defense counsel made an immediate objection during Sweezer's testimony and defendant's motion for a new trial included the assertion that the trial court erred when it "overruled [d]efendant's hearsay objections regarding the officers['] testifying to what other officers were saying and announcing while on scene and engaged in pursuit of" defendant.

truth of the matter asserted is generally admissible because it is not hearsay." *People v. Dunmore*, 389 Ill. App. 3d 1095, 1106 (2009). In considering a hearsay claim, a court must first determine whether the challenged statement is, in fact, hearsay. *People v. Hammonds*, 409 Ill. App. 3d 838, 854 (2011). If the statement is hearsay, the court must then determine whether the statement is nonetheless admissible under one of the many hearsay exceptions. *Id.*

¶ 43     Here, the record shows that Sweezer testified on direct examination, over defense counsel's objection, that "Officer Sieman alerted to me that the defendant had a firearm on his left side." This testimony was repeated during direct examination of Collazo, where he stated that, after he observed the handgun, Sieman alerted to Sweezer because he also saw the handgun and defendant fled into the vacant lot nearby. Sieman's alert was made outside of court by a non-testifying officer and the substance of the alert provided evidence to support an element of the crime of AHC, precisely the type of evidence the hearsay rule seeks to limit.

¶ 44     As previously noted, the State contends that the statement was not offered to prove the truth of the matter asserted but to show the effect on the listener. In the alternative, the State contends that the hearsay statement qualified as an excited utterance, which is an exception to the hearsay rule.

¶ 45     We reject the State's characterization of Sieman's statement as an excited utterance. A statement is admissible as an excited utterance where it "relat[es] to a startling event or condition" and is "made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. Jan. 25, 2023). The rationale for this exception is that the event or condition is so startling that it "temporarily stills the capacity for reflection, thus producing statements free of conscious fabrication." *People v. Harris*, 134 Ill. App. 3d 705, 711 (1985). To be admissible under the excited utterance exception, "there must be an occurrence sufficiently

startling to produce a spontaneous and unreflecting statement, there must be an absence of time for the declarant to fabricate the statement, and the statement must relate to the circumstances of the occurrence." *People v. Sutton*, 233 Ill. 2d 89, 107 (2009). A court must consider the totality of the circumstances, which includes "the time elapsed between the event and the utterance, the nature of the event, the declarant's mental and physical condition, and the presence of self-interest." *People v. Dobbey*, 2011 IL App (1st) 091518, ¶ 44. Further, even though a situation may cause some excitement, that "does not mean that it rises to the level of a startling event capable of stilling the capacity for reflection." *People v. Abram*, 2016 IL App (1st) 132785, ¶ 75.

¶ 46    Here, Sieman's alert was made contemporaneously with the alleged observation of the gun, and it is clear from Sweezer's body-cam footage that the time between defendant walking away from the group to when defendant ran through the vacant lot was only seconds. Thus, there was little time for Sweezer to fabricate the statement and the statement clearly related to the situation before the officers.

¶ 47    However, prior to Sieman's alert, the officers were on a routine patrol of a gang-conflict area and there were no exigent circumstances, such as violent or dangerous activity, leading up to Sieman's observation. Moreover, defendant did not remove the gun from his waistband, shoot the gun, or point it in anyone's direction. See *People v. Simon*, 2011 IL App (1st) 091197, ¶ 82 (observing a gun in a person's waistband is a less startling event than being threatened with a gun). Lastly, Collazo testified that he and Sieman had a quick conversation regarding the gun they allegedly observed before Sieman exited the car. These several facts weaken the State's argument that Sieman's alert was an excited utterance. Moreover, as evidenced by the plethora of decisional law involving weapons possession in our court alone, police officers routinely encounter circumstances like those in the instant case. In any case, on these facts, we cannot agree with the

State that Sieman's alert was an excited utterance and therefore no exception to the hearsay rule applied.

¶ 48    We next consider whether Sweezer's testimony was admissible to show the effect of Sieman's alert on the listener, which renders the testimony nonhearsay. Before proceeding, we note that defendant argues in his brief that the State cannot take refuge in Sieman's alert being admissible course-of-investigation testimony. However, here on appeal, the State actually argues that the testimony is admissible nonhearsay to show the effect on the listener or to explain the subsequent conduct of another person and thus was not offered for the truth of the matter asserted.[3] Specifically, the State contends that "Sweezer's and Collazo's momentary references to Sieman's alert were offered to contextualize and explain" why they pursued defendant. Additionally, according to the State, it was not using investigative procedure to place substantive information before the jury and thus it makes "no suggestion *** that Sieman's statement necessarily falls into any 'police-investigation'-specific nonhearsay exception." We read this to mean that the State concedes that the testimony does not constitute admissible course-of-investigation evidence. In any case, notwithstanding the parallels between effect-on-the-listener nonhearsay and course-of-investigation nonhearsay, we focus our analysis on whether the testimony at issue was limited to showing the effect on the listener, as the State contends.

¶ 49    "Statements that are offered to show their effect on the listener or to explain the listener's subsequent course of conduct are not hearsay." *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 76. However, "[t]hat an out-of-court statement may explain a listener's course of conduct *** does not mean that the *contents* of the statement are admissible without limitation." (Emphasis in

---

[3] The State did not make any specific arguments on this issue in response to defendant's motion for a new trial in the court below.

original.) *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 89. As such, the probative-value-versus-prejudicial-effect test remains applicable to this type of evidence, and the evidence may be nonetheless excluded where the prejudicial effect substantially outweighs its probative value. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 80.

¶ 50    We can agree with the State that Sweezer's testimony that Sieman alerted that defendant had a gun explained why he subsequently chased defendant. Similarly, Collazo's testimony regarding Sieman's alert also explained why Sieman then exited the vehicle and followed Sweezer. The testimony regarding the alert clearly served the purpose of showing the basis for the officers' subsequent conduct or its effect on the officers.

¶ 51    However, the prejudicial effect of the testimony cannot be ignored under these circumstances. Significantly, the *only* issue at defendant's jury trial was whether he possessed a gun. Thus, by revealing the substance of Sieman's alert, the testimony also went to the essential element of the State's case. Compare *People v. Warlick*, 302 Ill. App. 3d 595, 600-01 (1998) (testimony of a radio call regarding "a burglary in progress" was inadmissible where the defendant's sole defense at trial was that he was seeking shelter at the location and not burglarizing it), with *People v. Townsend*, 275 Ill. App. 3d 200, 203 (1995) (a police radio dispatch about an "armed robbery in progress" was admissible where the issue at trial was whether the defendant had committed the robbery, not whether a robbery had occurred). Because the testimony, regardless of its intended purpose, bolstered the other officers' observation of defendant's possession of a gun, "[t]he risk of the jury misusing the evidence was palpable" and the potential prejudicial effect was clear. *Warlick*, 302 Ill. App. 3d at 601.

¶ 52    Even where testimony explains the subsequent conduct of the listener, such testimony should not go "beyond what may have been necessary" to the extent that the introduction "borders

upon prejudicial error." *People v. Vincent*, 92 Ill. App. 3d 446, 457 (1980). We believe that the testimony here exceeded the bounds of what was necessary and that its prejudicial effect outweighed its value of explaining the officers' pursuit. Thus, the testimony, as offered, should not have been admitted.

¶ 53 The State, however, asserts that there was no way to "distill Sieman's statement even further." It was the State's burden to prove the elements of the offense beyond a reasonable doubt. Thus, it was the State's burden to determine what evidence was relevant and admissible to meet their burden. That they could not further "distill" Sieman's statement, a point with which we are reticent to agree, neither excuses any error nor avoids any prejudicial effect. See *People v. O'Toole*, 226 Ill. App. 3d 974, 988 (1992) (Out-of-court statements showing a subsequent course of conduct "should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information."). Further, the court having overruled defendant's objection to the statement, permitted its admission as competent evidence, offered for the truth of the matter asserted, without limitation.

¶ 54 Finally, we reject the State's reliance on *People v. Griffin*, 2022 IL App (1st) 190499, and *People v. Hammonds*, 409 Ill. App. 3d 838, 856 (2011), because, in both cases, the declarant of the out-of-court statements also testified at trial and was subject to cross-examination. This distinction cannot be overlooked, and we find those cases inapposite for that reason.

¶ 55 In sum, Sweezer's testimony as to Sieman's alert was not an excited utterance and, even if offered to show the effect of the alert on the other officers, *i.e.* a nonhearsay purpose, it was not properly limited and was more prejudicial than probative. As such, the testimony was inadmissible and should have been excluded, and we therefore conclude that the trial court abused its discretion in allowing Sweezer's testimony. See *People v. Hudson*, 2023 IL App (1st) 192519, ¶¶ 87-88

(explaining how a violation of the evidentiary rules against hearsay result in an abuse of discretion, despite the deferential standard).

¶ 56    Nonetheless, the erroneous admission of inadmissible hearsay does not necessitate reversal where there is no reasonable probability that the jury would have come to different verdict had the hearsay been properly excluded, *i.e.* where the error was harmless. *Jura*, 352 Ill. App. 3d at 1089; see *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 37 ("The remedy for erroneous admission of hearsay is reversal, unless the record clearly shows that the error was harmless."). In determining whether an error was harmless, "a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008).

¶ 57    Defendant asserts that the jury's lengthy deliberation and the questions posed to the court during deliberations demonstrated that the evidence was not "overwhelming" and the verdict was a close decision. However, "the length of time a jury deliberates is not always an accurate indicator of whether the evidence was closely balanced." *People v. Walker*, 211 Ill. 2d 317, 342 (2004). Moreover, "[t]hat the jury asked for guidance during deliberations merely indicates that the jury took its job seriously and conscientiously worked to come to a just decision." *People v. Minniweather*, 301 Ill. App. 3d 574, 580 (1998). We decline to read into the jury's conduct proof of the closeness of the evidence. See *People v. Downs*, 2015 IL 117934, ¶ 27 ("courts should avoid attempting to divine anything about the jury's deliberative process" from jury questions). Even were we to conclude that the evidence against defendant was not "overwhelming," the error did

not contribute to defendant's conviction in a significant way and the improperly admitted evidence was merely cumulative. Thus, these considerations weigh against a finding of reversible error.

¶ 58     "Reversal for improperly admitted hearsay evidence is not warranted where properly admitted evidence proves the same matter." *People v. Songer*, 229 Ill. App. 3d 901, 906 (1992). Here, Collazo testified that, as defendant turned towards them, he "could see the butt of a handgun on his front, left waistband area which his shirt was kind of like tucked behind the gun a little bit." He also testified that he had an unobstructed view of defendant at that time. Further, during his pursuit of defendant, Sweezer observed defendant reach with his right hand towards his left side and then toss a gun into a nearby yard. Thus, the testimony from both officers proved the same matter, *i.e.* that defendant possessed a gun, based on their own personal observations. Thus, reversal is not warranted in this case where Sieman's alert was cumulative evidence of properly admitted evidence. See *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 65 (erroneous admission of hearsay evidence is harmless error where it is merely cumulative).

¶ 59     Defendant points us to *People v. Jura*, 352 Ill. App. 3d 1080 (2004), as an example of a case where the improper admission of hearsay testimony was found to be reversible error. However, that case is clearly distinguishable from the facts before us. In *Jura*, this court reversed and remanded for a new trial where the trial court improperly admitted the content of a police radio message as course-of-investigation evidence. *Id.* at 1088, 1095. In determining that the error was not harmless, the court emphasized that the hearsay evidence had been repeated by three police witnesses at least four times and the prosecutor substantively relied on the improper testimony in opening statement and closing argument in a manner that highlighted its prejudicial effect. *Id.* at 1090-91. Our review of the State's opening statement and closing argument here does not reveal any reference to Sieman's alert. In *Jura*, the reviewing court was particularly concerned with the

prosecution's intentional disabuse of course-of-investigation evidence as it was clear from the closing argument that the prosecution intended to use the elicited testimony to prove the truth of the matter asserted. Because that did not occur in this case, we find that the error likely did not contribute to the outcome. See *Warlick*, 302 Ill. App. 3d at 601 (hearsay admission was harmless error where "the State made no attempt to exploit [the evidence] during its final argument," avoiding exacerbation of the error).

¶ 60 Harmless error analysis does not ask "what the jury could have done, but what 'the jury *would have* done' " absent the improperly admitted evidence. (Emphasis in original.) *People v. Collins*, 2020 IL App (1st) 181746, ¶ 44 (quoting *People v. Parmly*, 117 Ill. 2d 386, 396 (1987)). In this case, without the improper testimony, there remained ample, credible evidence to support defendant's conviction where two police officers unambiguously testified that they saw defendant in possession of a gun. That testimony was not contradicted or impeached. And, even if Sieman's statement had been limited to only stating that he made an alert to Sweezer, a trier of fact could nonetheless infer that he observed defendant with a weapon, especially where Collazo had the same vantage point as Sieman. As such, we conclude that the error did not tip the scales against defendant and, thus, the error was harmless beyond a reasonable doubt. See *People v. Patterson*, 217 Ill. 2d at 428 (it "appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained").

¶ 61 C. Rule 431(b) Violation

¶ 62 Finally, defendant argues that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), commonly referred to as "the *Zehr* principles." See *People v. Zehr*, 103 Ill. 2d 472, 477-78 (1984). In particular, defendant asserts that the trial court failed to properly recite to the jurors the fourth principle under the rule (Ill. S. Ct. R. 341(b)(4)) in stating that

defendant's decision not to testify "may not be considered by you in any way in arriving at your verdict." Defendant contends that this phrasing was improper, and the court should have recited the principle exactly as written in the rule. Defendant acknowledges that he did not properly preserve this alleged error for review but argues that plain error review should apply because the evidence was closely balanced in this case.

¶ 63    The plain error rule is "a narrow exception to forfeiture principles designed to protect the defendant's rights and the reputation of the judicial process." *People v. Moon*, 2022 IL 125959, ¶ 21. Typically, under the plain error rule, reviewing courts have discretion to review forfeited errors under two alternative prongs: "(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* ¶ 20.   The burden is on the defendant to establish either prong. *Id.* In a case involving an alleged Rule 431(b) violation, the first step under either prong of the plain error doctrine is to assess if a clear or obvious error occurred. *People v. Selby*, 2017 IL 117094, ¶ 41. Our supreme court has held that a violation of Rule 431(b) is not a second-prong, structural error that requires automatic reversal under a plain error analysis. See *People v. Birge*, 2021 Il 125644, ¶ 24. We review a claim of Rule 431(b) error *de novo*. *Birge*, 2021 IL 125644, ¶ 24; *People v. Belknap,* 2014 IL 117094, ¶ 41.

¶ 64    Rule 431(b) requires a trial court to ask each juror whether that juror understands and accepts four basic principles: "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or

her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her[.]" Ill. S. Ct. R. 431(b). Rule 431(b) also provides that "[t]he court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning [these] principles[.]" *Id.*

¶ 65    Here, the trial court phrased the fourth principle as: "If the defendant chooses not to testify[,] the fact that he chooses not to do so may not be considered by you in any way in arriving at your verdict." The principle, verbatim, states: "[I]f a defendant does not testify it cannot be held against him or her[.]" Defendant argues that the court's deviation from a verbatim recitation of the rule was a violation and constituted plain error.

¶ 66    In support of his claimed error, defendant cites *People v. Schaefer*, 398 Ill. App. 3d 963 (2010). There, the defendant argued that the trial court failed to ask the prospective jurors whether they understood and accepted that the defendant's failure to testify could not be held against him. *Id.* at 966. The prospective jurors were only asked whether they "had any problem" with the first and second of the *Zehr* principles; they were not asked about the third and fourth principles. *Id.* at 967. After the jury was sworn, the trial court set forth all four principles to the jury. *Id.* However, the Second District of this court held that this did not cure the error because they were not asked whether they understood and accepted the principles and they were not given the opportunity to respond. *Id.* The court stated that "broad pronouncements of the law were insufficient protections to demonstrate each juror's understanding and accepting of the four principles." *Id.* The court next concluded that the error was so serious that the defendant was denied his right to a fair trial, and thus, the court remanded for a new trial. *Id.* at 968.

¶ 67    We fail to see how *Schaefer* in any way supports defendant's argument in support of a verbatim recitation of Rule 431(b) admonishments. Unlike in *Schaefer*, the trial court here did not merely give "broad pronouncements" of the principles; rather, the prospective jurors were asked

whether they understood and accepted each principle, and the jurors were then given an opportunity to respond. The court in *Schaefer* had no occasion to consider whether a verbatim recitation of the rule was required for compliance. Thus, *Schaefer* is inapposite.

¶ 68     The State cites to *Birge*, 2021 IL 125644, to rebut defendant's claimed error. However, the claimed error in *Birge*, unlike in the case now before us, was that the trial court admonished the venire by grouping the four *Zehr* principles into one broad statement of the law and failed to ensure that the potential jurors understood and accepted each of the four distinct concerns in the rule. *Id.* ¶ 23. Although factually inapposite, the court's discussion is nonetheless enlightening.

¶ 69     During *voir dire* in *Birge*, the trial court recited all four *Zehr* principles together. For the fourth principle, like in our case, the trial court stated that "[i]f the [d]efendant does not testify, that fact must not be considered by you in any way in arriving at your verdict." *Id.* ¶ 4. Ultimately, our supreme court held that there was no error where the trial court "carefully recited the four specific principles in the rule verbatim and then asked specific questions about whether the jurors accepted and understood those principles." *Id.* ¶ 38.

¶ 70     The State takes the position that, in *Birge,* the language used by the trial court in citing the fourth principle was explicitly endorsed by our supreme court. Mindful that the issue before the supreme court in *Birge* was the propriety of grouping the *Zehr* principles, we can perhaps find tacit approval by the supreme court of trial court's wording of the fourth principle. We decline, however, to go so far as to find an explicit endorsement. We find it somewhat noteworthy, however, that the supreme court characterized the trial court's statement of the fourth *Zehr* principle as a "verbatim," when clearly it was not. See *id.* ¶¶ 27, 38.

¶ 71     In any case, we have held that Rule 431(b) does not require the trial court to recite the principles therein verbatim. See *People v. Atherton*, 406 Ill. App. 3d 598, 611 (2010); see also

*People v. Kidd*, 2014 IL App (1st) 112854, ¶ 36 (Rule 431(b) does not expressly require that the specific language be used); *People v. Boyd,* 2022 Il App (4th) 190705-U, ¶ 79. We note additionally that in several other cases before this court, the trial court did not recite the fourth principle verbatim (*i.e.* did not use the language "cannot be held against him") when questioning the prospective jurors and, although that particular concern was not raised on appeal, this court nonetheless found that the trial court complied with Rule 431(b) in each case. *People v. Rodriguez*, 2022 IL App (1st) 200315, ¶ 44 (where the trial court stated: "You may not draw any inference from the fact that the defendant chooses to remain silent either in favor of or against defendant because he elects to remain silent"); *People v. Joseph*, 2021 IL App (1st) 170741, ¶ 25 (where the trial court stated: "[S]ince the Defendant has the absolute right to remain silent, you can't consider that either for or against him"); *People v. Morris*, 2013 IL App (1st) 110413, ¶¶ 76-83 (where the trial court stated: "Should the defendants choose not testify, you must not consider that decision in any way in arriving at your verdict"); *People v. Martin*, 2012 IL App (1st) 093506, ¶¶ 29, 71-78 (where the trial court stated: "You are to draw no inference from the fact that the defendant chooses to remain silent, either in favor of or against the defendant because he elects to remain silent"); *People v. Quinonez*, 2011 IL App (1st) 092333, ¶¶ 4, 44-50 (where the trial court stated: "The fact that [d]efendant does not testify must not be considered [by] you in any way in arriving at your verdict"); *People v. Ingram*, 409 Ill. App. 3d 1, 10-13 (2011) (where the trial court stated: "[Y]ou as jurors can draw no inference [from] the fact she chooses to remain silent in favor of [defendant] or against [defendant] if she chooses to remain silent"); but see *People v. McGuire*, 2017 IL App (4th) 150695, ¶¶ 34-35 (despite concluding that the defense counsel acquiesced to the improper admonishments, this court stated that trial courts "must not deviate in any way from the precise language chosen by the Illinois Supreme Court to be in that rule").

¶ 72    Here, the record reflects that, after the venire had been sworn, the trial court admonished the potential jurors pursuant to Rule 431(b). Immediately following the admonishments, the court inquired whether there was "anyone who does not understand and accept the legal principles of law[?] If so raise your hand." The record further reflects that no member of the venire raised his or her hand. Based upon our review of the law, we are satisfied that the court's pronouncement of the fourth *Zehr* principle sufficiently apprised the prospective jurors that defendant's decision not to testify could not be held against him, and the trial court did not violate Rule 431(b). Because the trial court committed no error, we need not determine whether the evidence was closely balanced in this case. See *Birge*, 2021 IL 125644, ¶ 42.

¶ 73                               III. CONCLUSION

¶ 74    For the reasons stated, we affirm the judgment of the circuit court.

¶ 75    Affirmed.